24 A.3d 319

COMMONWEALTH of Pennsylvania, Appellee

v.

Ralph BIRDSONG, Appellant.

Commonwealth of Pennsylvania, Appellee

v.

Ralph Birdsong, Appellant.

Commonwealth of Pennsylvania, Appellee

v.

Ralph Birdsong, Appellant.

Supreme Court of Pennsylvania.

Submitted June 4, 2003.

Decided May 26, 2011.

204

206

208

210

212

Ellen Berkowitz, Billy Horatio Nolas, David Warren Wycoff, Philadelphia, for Ralph Birdsong.

Hugh J. Burns Jr., Philadelphia District Attorney's Office, Philadelphia, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice EAKIN.

Ralph Birdsong appeals from the order denying his petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541–9546. We affirm.

Appellant was charged with first degree murder and related offenses for fatally shooting two people, seriously wounding six others, and raping a teenage girl during a brutal incident on July 17, 1988.[1] Appellant waived his right to a jury at both the guilt and penalty phases and was tried jointly with his brother Anthony, who was his co-conspirator. The trial court convicted appellant of two counts of first degree murder, six counts of aggravated assault, and one count each of rape, involuntary deviate sexual intercourse, conspiracy, and possession of an instrument of crime.[2]

At the penalty phase, the trial court found no mitigating circumstances[3] and two aggravating circumstances: 42 Pa.

1. The underlying facts are detailed in this Court's decision on direct appeal. *See Commonwealth v. Birdsong*, 538 Pa. 587, 650 A.2d 26, 28–30 (1994).

2. Anthony was convicted of the same crimes, except rape; he received two consecutive life sentences for the murders and an aggregate consecutive sentence of 42½ to 85 years imprisonment for the other offenses. The Superior Court affirmed on direct appeal. *Commonwealth v. (Anthony) Birdsong*, 408 Pa.Super. 643, 588 A.2d 557 (1990) (*per curiam*).

3. Appellant presented evidence of two mitigating circumstances: 42 Pa.C.S. § 9711(e)(3) (capacity of defendant to appreciate criminality of conduct or conform conduct to requirements of law was substantially

C.S. § 9711(d)(9) (defendant has significant history of felony convictions involving use or threat of violence to person) and 42 Pa.C.S. § 9711(d)(11) (defendant has been convicted of another murder committed in any jurisdiction either before or at time of offense at issue). Accordingly, the trial court imposed a death sentence for murder and a consecutive term of 52½ to 105 years imprisonment for the other offenses.

Appellant received new counsel and filed a direct appeal. This Court concluded appellant's claims were meritless and affirmed. *Birdsong, supra.*

Appellant filed a timely *pro se* PCRA petition and received new counsel, who filed an amended petition October 17, 1996. In April, 1997, counsel filed another amended petition, and the Commonwealth moved to dismiss. In the interim, the trial judge died, and a new judge was appointed for the PCRA proceedings. Following evidentiary hearings between September, 1999 and January, 2000, the PCRA court issued a notice of intent to dismiss appellant's petition as meritless; the court dismissed the petition February 26, 2001.

Appellant filed this appeal;[4] on April 26, 2002, this Court remanded to the PCRA court for preparation of an opinion, tolling the briefing schedule but retaining jurisdiction. In August, 2002, appellant filed a motion requesting this Court to expand the scope of the remand to include a new claim under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (execution of mentally retarded criminals violates

impaired) and 42 Pa.C.S. § 9711(e)(8) (any other evidence of mitigation concerning character and record of defendant and circumstances of offense).

4. The procedural history underlying this collateral appeal is somewhat convoluted. Appellant alleged he never received the order dismissing his PCRA petition and filed several documents April 6, 2001, requesting restoration of his appellate rights and leave to appeal *nunc pro tunc*. The PCRA court deemed these filings a second PCRA petition, which it dismissed as untimely April 11, 2001. The next day, appellant filed notices of appeal from the February 26, 2001 order dismissing his first petition and the April 11, 2001 order dismissing his second petition. The Commonwealth disputed the timeliness of these appeals; however, this Court denied the Commonwealth's motions to quash. Thus, we will consider appellant's claims, which only pertain to the February 26, 2001 dismissal of his first PCRA petition.

Eighth Amendment), which this Court granted. The briefing schedule resumed, and the case was submitted for decision June 4, 2003. When no PCRA court opinion had been filed as directed, this Court again remanded to the PCRA court on November 19, 2003, for preparation of an opinion, citing *Commonwealth v. Brown,* 574 Pa. 231, 830 A.2d 536, 537 (2003) ("In capital, post-conviction appeals, this Court has recently emphasized the necessity of ... an adequate written opinion of the PCRA court ... as ... necessary to provide the essential predicate for appellate review of the post-conviction proceedings by this Court.").

The PCRA court filed an opinion March 25, 2004, in which it addressed all of appellant's issues except for the *Atkins* claim, and noted the parties agreed to further continuances until the General Assembly issued legislation regarding what objective facts should be used to determine the prevailing standards of competency and the degree of mental retardation which would prohibit imposition of the death penalty. PCRA Court Opinion, 3/25/04, at 8–9. The court adopted the American Association of Mental Retardation's (AAMR) [5] definition of mental retardation, as set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed.1992) (DSM–IV), but did not address the merits of appellant's *Atkins* claim, instead advising the parties to prepare any defense testimony on the issue of mental retardation. PCRA Court Opinion, 3/25/04, at 9.

On June 23, 2004, a hearing was held before the PCRA court; the Commonwealth argued appellant's *Atkins* claim was not properly before the PCRA court because this Court had retained jurisdiction. N.T. Status Hearing, 6/23/04, at 4–6. The PCRA court agreed, and dismissed the claim without prejudice. *Id.,* at 6. Thus, there was no lower court ruling on the merits of appellant's *Atkins* claim.

This Court then decided *Commonwealth v. Miller,* 585 Pa. 144, 888 A.2d 624 (2005), adopting a definition of "mental retardation" and setting forth the procedure to follow when a

5. On January 1, 2007, the AAMR became known as the American Association on Intellectual and Developmental Disabilities.

defendant asserts an *Atkins* claim, as guidance from the legislature was not forthcoming. *See id.,* at 629–31. As the PCRA court had never ruled on the merits of appellant's *Atkins* claim, we remanded to the PCRA court to make credibility determinations and findings of fact on the merits, in accordance with the guidelines in *Miller.*

By order dated December 12, 2008, the PCRA court noted, "[Appellant] withdraws his *Atkins/Miller* claim (against advice of counsel). [Appellant] also withdraws all claims with regard to conflict of interests (with present counsel) and ineffectiveness (of present counsel) and wishes his appeals to proceed with current counsel on all other issues already presented." PCRA Court Order, 12/12/08. Accordingly, appellant's remaining issues are now properly before us for review.

In reviewing an order granting or denying post-conviction relief, we examine whether the PCRA court's determination is supported by the evidence and whether it is free of legal error. *Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167, 1176 (1999). To be entitled to relief under the PCRA, appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors or defects found in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, *id.,* § 9543(a)(3), and "the failure to litigate the issue prior to or during trial, ... or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.,* § 9543(a)(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue...." *Id.,* § 9544(a)(2). An issue is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding." *Id.,* § 9544(b).

Appellant claims ineffectiveness of trial and appellate counsel and trial court error; he also asserts he was denied full and fair collateral review at his PCRA hearing, and that the Commonwealth violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (prosecution's suppression of

evidence favorable to accused violates due process where evidence is material to guilt or punishment, irrespective of prosecution's good or bad faith).

### Brady Claim

Appellant argues the Commonwealth withheld material evidence favorable to the defense, in violation of *Brady*. He claims the Commonwealth failed to disclose: (1) Commonwealth witness Andre Kinard was offered immunity from unrelated criminal charges in exchange for his identification testimony against appellant; (2) the Commonwealth placed several key witnesses in a witness protection program, which provided them with free housing, stipends for living expenses, and relocation to another city; (3) electronic surveillance purportedly establishing members of one of appellant's rival drug factions planned to assassinate another drug dealer; and (4) the results of tests comparing appellant's blood and saliva samples with those recovered from the rape victim.

To establish a *Brady* violation, a defendant must show: the prosecution suppressed the evidence, either willfully or inadvertently; the evidence is favorable to the defense; and the evidence is material. *See Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d 872, 887 (2002). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.*, at 887–88 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Id.*, at 887 (quoting *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

Appellant points to Andre Kinard's PCRA testimony that the Commonwealth threatened to charge him with drug and weapons offenses if he did not identify appellant at trial as the shooter, and that he could not identify the shooter. *See* N.T. PCRA Hearing, 1/7/00, at 6–8. Appellant does not say

how this evidence would have affected the outcome of his trial; he appears to argue it would have impeached Kinard. Appellant overlooks the fact that recantation testimony is "exceedingly unreliable," and "there is no less reliable form of proof, especially when it involves an admission of perjury." *Commonwealth v. Abu–Jamal*, 553 Pa. 485, 720 A.2d 79, 99 (1998) (quoting *Commonwealth v. Anderson*, 466 Pa. 339, 353 A.2d 384, 386 (1976)). Given Kinard's testimony that he perjured himself at trial, and the factors surrounding his recantation,[6] the record supports the PCRA court's determination this witness was not credible, *see Abu–Jamal*, at 99 (credibility issues are within sole domain of trier of fact, who personally observed witness's demeanor) (citation omitted); thus, this proffered evidence does not meet the materiality test.

■ Appellant contends the Commonwealth's failure to disclose that it placed witnesses in a protection program and provided them with living expenses and immunity prejudiced his case because if trial counsel had known these facts, he would have insisted on a jury trial; a jury would have been more likely to be influenced by such information than a judge. Appellant fails to acknowledge that none of these witnesses recanted their identification of him as the shooter in their affidavits for the PCRA court, and the reason they had to be placed in protection programs was because they feared returning to the neighborhood where the murder occurred after they identified appellant. Such evidence would have raised the inference that appellant or one of his cohorts would retaliate; as it would not have changed the result at trial in appellant's favor, it was not material.

■ Appellant next alleges the Commonwealth's failure to disclose electronic surveillance tapes and transcripts supposedly establishing the Junior Black Mafia (JBM), a rival gang, planned to shoot one of appellant's rival drug dealers prejudiced his case; he argues this information supported the defense that someone else shot the victim during a botched

6. Kinard did not tell anyone his trial testimony was perjured until he was found guilty of first degree murder and sentenced to life imprisonment. N.T. PCRA Hearing, 1/7/00, at 54–56.

assassination attempt on the rival dealer. Appellant failed to demonstrate such surveillance evidence existed; he based his assertion on several newspaper articles published at the time of the shooting, which stated the police were investigating the JBM. As appellant failed to prove the evidence he sought exists, his claim was properly rejected.

■ Finally, appellant contends he was prejudiced by the Commonwealth's failure to disclose the results of blood and saliva tests comparing his samples to semen samples recovered from the rape victim; he claims this evidence would have discredited the rape victim's identification testimony and eliminated one of the aggravating circumstances. However, appellant failed to establish such comparative tests were ever performed; the Commonwealth informed the PCRA court no tests were performed because no testable blood groups were found in the semen taken from the victim. *See* N.T. PCRA Hearing, 9/8/99, at 46. This enabled appellant to argue there was no physical evidence linking him to the rape; accordingly, this claim was properly rejected.

### Ineffectiveness Claims

Regarding appellant's ineffectiveness claims, we note several of the issues underlying these claims were addressed on direct appeal; specifically, we addressed trial counsel's ineffectiveness for failing to move for change of venue, and trial court error in denying appellant's request to reopen the penalty phase so he could present expert mental health testimony. However, to the extent appellant now alleges appellate counsel's ineffectiveness in connection with these issues, his issues are distinct from those raised on direct appeal and have not been previously litigated. *See Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 570, 573 (2005) (term "issue" as used in §§ 9543(a)(3) and 9544(a)(2) "refers to the discrete legal ground that was forwarded on direct appeal and would have entitled the defendant to relief . . . ."; ineffectiveness claims are distinct from claims raised on direct appeal and must be treated as wholly independent of underlying claim of error).

Regarding waiver, appellant's present issues concerning trial court error and trial counsel's ineffectiveness were not raised at trial or on direct appeal;[7] thus, these claims are waived. 42 Pa.C.S. § 9544(b). However, appellant may obtain relief if he can show appellate counsel was ineffective for failing to pursue these claims. *See Commonwealth v. Rush*, 576 Pa. 3, 838 A.2d 651, 656 (2003) (citing *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1022 (2003) (when court is faced with "layered" ineffectiveness claim, only viable ineffectiveness claim is that related to most recent, appellate counsel)).

■ To preserve a "layered" ineffectiveness claim,

a petitioner must *"plead*, in his PCRA petition," that appellate counsel was ineffective for failing to raise all prior counsel's ineffectiveness. Additionally, a petitioner must *"present* argument on, i.e. develop each prong of the [*Commonwealth v.*] *Pierce* [, 515 Pa. 153, 527 A.2d 973 (1987) ] test" as to appellate counsel's deficient representation. "Then, and only then, has the petitioner preserved a layered claim of ineffectiveness for the court to review; then, and only then, can the court proceed to determine whether the petitioner has proved his layered claim."

*Id.* (citations and footnote omitted); *see also McGill*, at 1021–23.

■ The *Pierce* test requires appellant to prove, with respect to appellate counsel's performance, that: (1) the under-

7. *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002) abrogated the rule that claims of trial counsel's ineffectiveness must be raised at the first opportunity where appellant has new counsel, *see Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977); *see also Commonwealth v. Chmiel*, 536 Pa. 244, 639 A.2d 9, 12 (1994) (ineffectiveness claim must be raised at earliest stage at which counsel whose stewardship is being challenged no longer represents appellant), and instead held a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." *Grant*, at 738. At the time of appellant's trial, direct appeal, and PCRA proceedings, however, *Grant* was not decided; therefore, on direct appeal, appellant was required to raise his claims of trial counsel's ineffectiveness in order to avoid waiver. Having failed to raise them on direct appeal, he was required to layer them by alleging the ineffectiveness of both trial and appellate counsel in his PCRA petition. *See Hubbard*, at 695 n. 6.

lying claim of trial counsel's ineffectiveness has arguable merit;[8] (2) appellate counsel had no reasonable basis for failing to pursue the claim; and (3) but for appellate counsel's ineffectiveness, the result on direct appeal would have differed. *See id.*, at 1022–23. This "performance and prejudice" test was enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and was recognized in *Pierce* as the proper test under the Pennsylvania Constitution. Failure to establish any prong of the test will defeat an ineffectiveness claim. *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 738 n. 23 (2000) (citing *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 441 (1999) (ordinarily, post-conviction claim of ineffective assistance of counsel may be denied by showing petitioner's evidence fails to meet single one of three prongs for claim)).

Appellant's PCRA petition and appellate brief were filed prior to *McGill* and *Rush*'s clarification of the pleading and preservation requirements for layered ineffectiveness claims. In his PCRA petition, appellant did not plead layered ineffectiveness in connection with every issue; instead, he relied on the relaxed waiver principle formerly employed by this Court in capital appeals, which was in effect at the time he filed his petition.[9] *See* PCRA Petition, at 5–8. Appellant's appellate brief includes a catch-all, boilerplate assertion of all prior counsel's ineffectiveness for failing to litigate these issues, *see* Appellant's Brief, at 7, and he presents argument on his underlying claims of trial error and trial counsel's ineffectiveness, satisfying the first prong of *Pierce* with respect to appellate counsel; however, his development of the remaining two prongs regarding appellate counsel's stewardship is cursory.

8. An assessment of this prong requires appellant to establish each *Pierce* prong with respect to trial counsel's performance. Under this prong, trial counsel's performance must be addressed in order to determine whether appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness. *See Rush,* at 656.

9. This Court abolished relaxed waiver in capital PCRA appeals in *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 700 (1998).

■ Where an appellant has established the arguable merit of his claim of trial counsel's ineffectiveness, the first prong of *Pierce* with respect to appellate counsel, remand may be warranted to develop the remaining two prongs. *Rush*, at 656–57. "Nevertheless, there is simply no need to remand a PCRA petition when the petitioner has not carried his *Pierce* burden in relation to the underlying claim of trial counsel's ineffectiveness, since even if the petitioner were able to craft a perfectly layered argument in support of his claim, the petitioner's claim would not entitle him to relief." *Id.*, at 657–58, 576 Pa. 3.

As discussed below, all of appellant's underlying claims of trial court error and trial counsel's ineffectiveness fail; his claims of appellate counsel's ineffectiveness are necessarily defeated as well. *McGill*, at 1023. Therefore, we need not remand to develop the remaining two prongs of *Pierce* with respect to appellate counsel. *See Rush*, at 657–58; *McGill*, at 1025. We now address appellant's remaining claims, which we have reworded and reordered for ease of discussion.

### Guilt Phase

*Whether the trial judge should have recused herself on the basis of bias.*

■ Appellant claims the trial judge was biased against him because she was aware of his juvenile record and had presided over numerous cases involving appellant's siblings in juvenile and family court. He claims trial counsel should have discovered the judge's bias and filed a recusal motion, and appellate counsel should have raised this issue on direct appeal. In the alternative, and in curious juxtaposition, appellant claims the trial judge failed to consider this background evidence as a mitigating circumstance under § 9711(e)(8)'s "catch-all" mitigator.

■ "It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Abu–Jamal*, at 89. Here, there was no recusal request by counsel; appellant claims appellate counsel

should have cited trial counsel's failure to investigate the trial judge's familiarity with appellant's family and move for recusal. The evidence appellant presented in support of this claim at the PCRA hearing, however, was paltry and insubstantial, consisting of affidavits by appellant's father [10] and some of his siblings. The PCRA court concluded appellant's father's affidavit could not be admitted as substantive evidence because it was not subject to cross-examination, and the court could not determine the witness's credibility. *See* N.T. PCRA Hearing, 1/21/00, at 12–13. The court noted petitioner's siblings' affidavits were unsworn, not notarized, and made only vague claims they remembered the trial judge presiding over some of their siblings' family court cases. PCRA Court Opinion, 3/25/04, at 17.

The allegedly prejudicial trial rulings appellant cites [11] do not demonstrate an inability by the jurist to render an impartial verdict; "[a]dverse rulings alone do not . . . establish the requisite bias. . . ." *Abu–Jamal*, at 90. The rulings appellant complains of demonstrate nothing more than the judge's efforts to manage the trial and her courtroom. Regarding appellant's alternative claim that the judge should have considered her alleged prior courtroom encounters with his family as mitigating evidence under § 9711(e)(8), the judge was under no duty to consider mitigating evidence not presented at the penalty phase; such evidence was outside the record. Appellant essentially argues it would have been acceptable for the judge to be biased, as long as it was in his favor. Appellant's recusal claim is meritless; therefore, remand for further development regarding appellate counsel's ineffectiveness is not warranted. *McGill*, at 1025.

10. The statement by appellant's father, who died prior to the PCRA hearing, alleged that during a prior conversation concerning charges against his other sons, the trial judge commented it was common knowledge that his sons were guilty because they came from a criminal family and were bad kids. *See* Appellant's Brief, at 40.

11. Appellant asserts the trial judge suggested he and his brother intimidated witnesses, denied his multiple requests for continuances to obtain witnesses, denied his requests to recall witnesses, and sentenced him to death. *See* Appellant's Brief, at 42.

*Whether appellant was entitled to a change of venue on the basis of pre-trial publicity through electronic media coverage.*

 Appellant claims appellate counsel[12] was ineffective for not mentioning the electronic media coverage in arguing trial counsel's ineffectiveness for failing to move for change of venue; on direct appeal, appellate counsel only mentioned the print media coverage appellant's case received. Appellant points to appellate counsel's failure to cite any tactic for this omission. *See* N.T. PCRA Hearing, 9/7/99, at 27–28.

 "The mere existence of pretrial publicity does not warrant a presumption of prejudice." *Commonwealth v. Chambers,* 546 Pa. 370, 685 A.2d 96, 103 (1996) (citations omitted). This Court noted, in determining whether pre-trial publicity was inherently prejudicial:

> [O]ur inquiry must focus upon whether any juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pre-trial publicity. Pre-trial publicity will be deemed inherently prejudicial where the publicity is sensational, inflammatory, slanted towards conviction rather than factual and objective; revealed that the accused had a criminal record; referred to confessions, admissions or re-enactments of the crime by the accused; or derived from reports from the police and prosecuting officers.

*Commonwealth v. Marinelli,* 547 Pa. 294, 690 A2d 203, 213 (1997) (quoting *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439, 450 (1995)).

> If any of these factors exists, the publicity is deemed to be inherently prejudicial, and we must inquire whether the publicity has been so extensive, so sustained, and so pervasive that the community must be deemed to have been saturated with it. Finally, even if there has been inherently

12. Appellant's claim concerning trial counsel's ineffectiveness for failing to challenge venue was raised and rejected on direct appeal; thus, it is previously litigated. *See Birdsong,* at 30–32; PCRA Court Opinion, 3/25/04, at 14–15. His claim of appellate counsel's ineffectiveness for failing to include electronic media coverage in the venue challenge, however, has not been litigated and is properly before us. *See Collins,* at 573.

prejudicial publicity which has saturated the community, no change of venue is warranted if the passage of time has sufficiently dissipated the prejudicial effects of the publicity. *Chambers*, at 103 (citations omitted).

Because appellant waived his right to a jury at the guilt phase, there was no danger any jurors would have a fixed opinion about his guilt; however, he argues he waived a jury at this stage because trial counsel failed to move for a change of venue. He claims the pervasive television and radio publicity about the crime and his apprehension in Florida was inflammatory and sensational, and revealed his prior criminal record; thus, he was afraid to be tried in the county where the residents were exposed to such media coverage.

The record belies this claim; although appellant's brother expressed concern that pre-trial publicity would make it impossible to pick a fair jury and that was why he was waiving his right to a jury, *see* N.T. Trial, 10/18/89, at 23, 37–38, appellant never voiced such concern, and he expressly affirmed his decision to waive a jury was his own, made freely, and that he was satisfied with counsel's performance. *See id.*, at 5, 22, 24–26, 38–39. Additionally, trial counsel testified he feared a change of venue to a more remote area would have resulted in a venire panel which would have been more horrified by the facts of the crime than one from urban Philadelphia. N.T. PCRA Hearing, 9/13/99, at 179–81; *id.*, at 180 ("We figured if we filed a motion for change of venue, the worst thing would happen is they would grant it."). Thus, as trial counsel's strategy was reasonable, appellant's claim concerning appellate counsel's ineffectiveness fails; remand for further development is unnecessary. *McGill*, at 1025.

*Whether the Commonwealth's initiation of forfeiture proceedings deprived appellant of counsel of his choice.*

Appellant contends he was denied his right to counsel of his choice when the Commonwealth seized assets he would have used to pay counsel. The Commonwealth initiated civil forfeiture proceedings against appellant for seizure of his personal and real property related to drug charges pending

against him. Appellant claims he would have used these assets to pay the private attorney he had retained, but was instead forced to rely on appointed counsel, who was inadequately compensated and lacked the resources to defend a very complex, protracted matter involving multiple criminal prosecutions and forfeiture actions. The PCRA court held this claim was not cognizable under the PCRA, as claims based on civil forfeiture proceedings are not included in § 9543(a)(3)'s grounds for relief. *See* PCRA Court Opinion, 3/25/04, at 15. However, appellant argues trial and appellate counsel were ineffective for failing to raise the claim; thus, it is a cognizable, legally discrete issue. *See Collins,* at 570–73.

Appellant relies on *Commonwealth v. Hess,* 532 Pa. 607, 617 A.2d 307 (1992), which held application of the forfeiture statute, 42 Pa.C.S. § 6801(a)(6)(i)(A), to funds received by an attorney as a retainer to represent the defendant violated the defendant's right to counsel under Pa. Const. art. I, § 9. *See Hess,* at 313–15. In *Hess,* however, the funds were already paid to retain the attorney representing the defendant; here, appellant does not allege the funds were seized from those already paid to counsel of his choice. As appellant's underlying claim is meritless, trial counsel cannot be deemed ineffective, and remand for further development of the claim pertaining to appellate counsel is unwarranted. *McGill,* at 1025.

*Whether trial counsel failed to conduct a professionally responsible investigation, failed to impeach Commonwealth witnesses, improperly stipulated to key pieces of Commonwealth evidence, pursued an implausible defense theory, and failed to test the Commonwealth's case.*[13]

 In evaluating the series of claims in this issue, we are mindful that attorney performance is to be assessed without the distortion of hindsight; rather, we must reconstruct the circumstances under which counsel's decisions were made and

13. In conjunction with this claim, appellant contends he would not have waived a jury at the guilt phase if counsel had properly investigated and made available the defense of diminished capacity. Appellant did not raise this issue in his PCRA petition; therefore, it is waived. *See* Pa.R.A.P. 302(a) (issues not raised in lower court are waived and cannot be raised for first time on appellate review).

evaluate counsel's conduct from his perspective at that time. *See Strickland,* at 689, 104 S.Ct. 2052

 Appellant first claims trial counsel should have investigated and presented evidence of his drug abuse and mental health issues at the guilt phase; he points to statements of arresting officers concerning his intoxicated state, statements of friends, family, and former counsel regarding his longstanding drug addiction, and reports of defense mental health experts who testified at the PCRA hearing that he suffered from Post Traumatic Stress Disorder (PTSD) and drug-induced psychosis at the time of the offense.[14] He contends, based on the above evidence, trial counsel should have presented a diminished capacity defense, and trial counsel's presentation of a misidentification defense was unreasonable. However, appellant never admitted to killing the victims, a prerequisite for claiming diminished capacity. As appellant maintained, even at the PCRA proceedings, that he did not commit the murders, *see* N.T. PCRA Hearing, 9/7/99, at 75, the defense of diminished capacity was not available, and trial counsel was not ineffective for failing to raise it. *See Commonwealth v. Johnson,* 572 Pa. 283, 815 A.2d 563, 578–79 (2002) (counsel not ineffective for failing to pursue diminished capacity defense where defendant denied killing victim).

 Appellant contends trial counsel failed to conduct an adequate investigation of impeachment evidence of key Commonwealth witnesses. Specifically, he claims Greg Johnson, who identified appellant at trial as the shooter, told Ruben Brezeal and Gregory Moton he had not seen the shooter. *See* Affidavit/Declaration of Ruben Brezeal, 1/13/97, at ¶ 3; Affidavit/Declaration of Gregory Moton, 1/19/97, at ¶¶ 3, 7. Appellant claims Johnson told John Craig Haynes that he named appellant as the shooter because police were threatening to charge him with drug trafficking if he did not implicate appellant. *See* Affidavit/Declaration of John Craig Haynes, 3/27/97, at ¶¶ 2–3. Appellant claims Kim Glenn, Moton, and Brezeal all

14. This evidence is detailed *infra,* in our discussion of appellant's claim that trial counsel was ineffective for failing to present it as mitigating evidence during the penalty phase.

knew Johnson was capable of "doing some pretty sleazy things . . . pretty much anything[,]" and would do whatever he had to do to save himself. Affidavit/Declaration of Kim Glenn, 1/10/97, at ¶ 15; *see also* Affidavit Declaration of Gregory Moton, 1/19/97, at ¶ 4; Affidavit/Declaration of Ruben Brezeal, 1/13/97, at ¶ 6. Appellant also claims Brezeal could have impeached Yianna Pannell, who identified appellant as her rapist; Brezeal would have stated Pannell was confused about who raped her and could not recall the event clearly. *See* Affidavit/Declaration of Ruben Brezeal, 1/13/97, at ¶ 3.

To be entitled to relief on a claim of ineffectiveness for failure to call a witness, appellant must demonstrate: the witness existed, was available, and willing to cooperate; counsel knew or should have known of the witness; and the absence of the witness's testimony prejudiced appellant. *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 275 (2000), *overruled on other grounds.* Trial counsel vigorously cross-examined Johnson and Pannell at trial, questioning the veracity of their identifications and suggesting motives for them to testify falsely; he painted the picture of a rivalry between appellant's drug ring and another the victims were involved with, describing an assault by appellant on members of the victims' organization just days before the shooting, thus supplying the victims with a motive to falsely implicate appellant as the shooter. Counsel argued none of the witnesses who identified appellant did so immediately, but rather only at other witnesses' urgings once they were told of appellant's prior assault. As the PCRA court found, appellant fails to demonstrate the testimony of the witnesses he now offers would have contributed anything "more than hearsay, conjecture and unsubstantiated rumors." PCRA Court Opinion, 3/25/04, at 24. Furthermore, trial counsel testified he was aware of Brezeal, but declined to use him as a witness because he did not find him credible; Brezeal told counsel he would not testify unless he was paid. *See* N.T. PCRA Hearing, 9/13/99, at 154. Therefore, we cannot say the absence of these witnesses' testimony prejudiced appellant.

■ Appellant claims trial counsel was ineffective for proceeding with a misidentification defense when there was evidence pointing to the JBM, a drug organization which dominated the neighborhood where the shooting occurred, as being responsible for the shooting.[15] Appellant points to statements from Kinard and Moton, who stated Haynes was a drug dealer and rival of the JBM, and opined the shooting was an attempt to get back at Haynes, who lived several doors down from the crime scene. *See* Affidavit/Declaration of Andre Kinard, 1/15/97, at ¶¶ 2-3, 7; Affidavit/Declaration of Gregory Moton, 1/19/97, at ¶¶ 5-7. Appellant also cites an FBI agent's statement that "[appellant] stated [the] reason why he left Philadelphia [was] that he heard Black Mafia was out to kill him. He didn't know where [the] rumor came from[,] and didn't have any names[,] or the reasons why[.]" Investigation Interview Record of Special Agent Ronald G. Risner, 11/21/88, at 3. Finally, appellant cites numerous newspaper articles detailing the drug war between the JBM and its rivals. *See* Appellant's Brief, at 81–82. He claims trial counsel should have been aware of the JBM's connection with the shootings and pursued this version of defense instead of arguing two Jamaicans were responsible for the shooting.

Counsel testified that after receiving little cooperation from people in the crime scene's neighborhood, he discovered information, corroborated by two police reports, placing two Jamaicans at the scene near the time of the shooting. *See* N.T. PCRA Hearing, 9/8/99, at 24; N.T. PCRA Hearing, 9/14/99, at 4–5. Appellant never said anything about the JBM being involved, and the evidence concerning the Jamaicans was "the only evidence [counsel] had that there was somebody else that

15. The PCRA court concluded this issue was previously litigated because on direct appeal, we held trial counsel's defense theory was reasonable in connection with his choice to elicit testimony concerning appellant's prior criminal activity; counsel used this testimony to support his strategy of proving someone else committed the shooting and the identification witnesses had lied. *See Birdsong*, at 244, 24 A.3d at 344; PCRA Court Opinion, 3/25/04, at 14–15. We held this strategy was reasonable, *Birdsong*, at 244, 24 A.3d at 344; however, we did not hold so specifically regarding counsel's decision to pursue this defense over the one appellant now purports was more viable. Accordingly, we will address the merits of appellant's claim.

did this, and [appellant] continually said he didn't." *Id.*, at 5. Counsel opted to present the testimony of the taxi driver who dropped the Jamaicans off at the scene shortly before the shooting and that of a victim who gave a description of one of the perpetrators which matched that given by the taxi driver. Aside from the conjecture of Kinard's and Moton's statements, there is nothing directly linking the JBM to the shooting, and we cannot say trial counsel chose an unreasonable defense, given the dearth of witness cooperation he received.

▮▮ Appellant claims trial counsel should not have stipulated to a police crime lab report which stated a jacket recovered from the vehicle he fled from contained human blood; he contends this stipulation undermined the misidentification defense by essentially conceding his presence at the crime scene. However, appellant overlooks the fact the police report containing the description of the jacket was admissible evidence, which would have been presented through a police department chemist's recitation of its facts. Trial counsel testified he stipulated to this evidence to avoid having the fact-finder hear such a gory recitation. *See* N.T. PCRA Hearing, 9/14/99, at 3–4. Trial counsel did not actually stipulate to appellant's presence at the scene; he merely agreed to the facts contained in the police report, which would have been admitted in a manner far more prejudicial to the defense had he not done so. Additionally, as the PCRA court noted, even if the report arguably placed appellant at the crime scene, it merely corroborated the overwhelming eyewitness testimony and was not the only proof of his culpability. *See* PCRA Court Opinion, 3/25/04, at 20. Accordingly, we cannot say such decision was without reasonable basis or that appellant was prejudiced by it.

▮▮ Appellant claims trial counsel should not have stipulated to the results of a rape kit showing semen was found in Pannell's vagina and anus; no testable blood groups were found in the semen recovered from Pannell, so the Commonwealth never had the samples it collected from appellant analyzed to determine if they matched the rape kit sample. *See* N.T. PCRA Hearing, 9/8/99, at 46. Appellant contends, in

light of the tests' inconclusiveness, trial counsel should have argued appellant did not commit the rape. He further contends his brother, Michael, admitted to having sex with Pannell that evening, and that other evidence pointed to Michael as the perpetrator. He argues trial counsel should have more vigorously pursued the theory that Michael, not appellant, committed the rape.

Trial counsel testified that, rather than challenge the Commonwealth's failure to have appellant's samples analyzed and have the results come back as "another nail in the coffin[,]" *id.*, at 54, 56, he chose to stipulate to the rape kit's inconclusive results. All these results showed was that someone had sex with the victim; there was nothing linking appellant to the rape. Furthermore, trial counsel called Michael Birdsong to testify, purportedly, that he was the one who committed the crimes; when Michael invoked his Fifth Amendment rights and did not testify, appellant argued on direct appeal that he should have been granted a continuance to present Michael's testimony. We held, "[E]ven if Michael testified that it was he, not [a]ppellant, that committed the crimes, this testimony would have been of little value in light of the testimony of the many eyewitnesses who knew [a]ppellant and identified him as the shooter." *Birdsong*, at 35. Likewise, any challenge trial counsel could have raised regarding the rape kit or Michael's culpability would have paled in the face of the other evidence linking appellant to the crimes. Therefore, we cannot conclude trial counsel's performance was unreasonable or prejudicial to appellant.

As appellant's claims of trial counsel's ineffectiveness fail,[16] there is no need to remand for development of the claims concerning appellate counsel. *McGill*, at 1025.

*Whether appellant's joint trial with his brother was improper because of antagonistic defenses.*

 Appellant claims his brother's defense portrayed appellant as the exclusive driving force behind the crimes, and

16. Again appellant contends had he known about these potential defenses and challenges trial counsel could have advanced, he would not have waived a jury at the guilt phase. For the same reasons expressed in n. 13, *supra*, we reject this claim.

was so antagonistic to his defense that the two were irreconcilable and mutually exclusive; he argues this portrayal precluded him from presenting evidence in support of the § 9711(e)(7) mitigator (defendant's participation in homicidal act was relatively minor). He further contends his brother's questioning of Commonwealth witnesses emphasized their identification of appellant and the evidence of his other crimes, and asserts he was tainted by evidence the Commonwealth presented concerning his brother's tampering with a witness. Thus, appellant argues, trial counsel should have moved for severance.

The decision to sever co-defendants' trials lies within the trial court's discretion, and will not be disturbed absent an abuse thereof. *Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 771 (1998). Joint trials are favored when judicial economy will be served by avoiding the expensive and time-consuming duplication of evidence, and where the defendants are charged with conspiracy. *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 501 (1995).

> "[T]he mere fact that there is hostility between defendants, or that one may try to save himself at the expense of another, is in itself not sufficient grounds to require separate trials. In fact, it has been asserted that *the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial* because the truth may be more easily determined if all are tried together."

*King*, at 771 (quoting *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1373 (1991)) (emphasis added). A defendant claiming there is possibility of conflicting or antagonistic defenses "must show a real potential for prejudice and not just mere speculation." *Jones*, at 501, 668 A.2d 491.

Appellant fails to demonstrate he was prejudiced by being tried jointly with his brother. Each co-defendant attempted to minimize his own role in the crime and make the other appear to be the instigator; this is a common strategy which is a reason for, not against, a joint trial. *King*, at 771. As the PCRA court noted, appellant fails to establish how the

outcome of his trial would have differed had he been tried separately, "when the undisputed evidence, including numerous eye-witnesses, placed [him] at the scene of the crime as the shooter and the rapist." PCRA Court Opinion, 3/25/04, at 19–20. Thus, appellant's underlying severance claim lacks merit, he cannot prevail on his claim of trial counsel's ineffectiveness, and remand is unnecessary for further development of this claim as it pertains to appellate counsel. *McGill,* at 1025.

## Penalty Phase

*Whether appellant's waiver of a sentencing jury was invalid.*

Appellant claims he did not receive a proper colloquy informing him he could waive a jury at trial but still have one at sentencing, and he was not informed of potential aggravating and mitigating factors, the burden of proof regarding these factors, or the requirement that a jury's death verdict be unanimous. Appellant acknowledges his participation in a waiver colloquy prior to the guilt phase, but contends he should have received a separate colloquy prior to the penalty phase to determine if he still wanted to waive a jury at sentencing; he claims the prosecutor mislead him into believing if he waived a jury at the guilt phase, then he had to waive it at the sentencing phase as well.

"Under Pennsylvania law, a capital defendant tried without a jury in the guilt phase retains the right to a jury in the penalty phase ... unless he specifically waives that right without objection by the Commonwealth." *Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 70 (2003) (citing 42 Pa.C.S. § 9711(b)). While this Court has not provided a mechanical listing of what must be included in a colloquy regarding waiver of a penalty phase jury, we have made clear:

[T]he colloquy must be an on-record dialogue, ... calculated to insure the defendant comprehends the nature and significance of the right being waived. At the very least, ... the defendant should be asked if he understands that he has the

right to be sentenced by a penalty-phase jury, whether any waiver to that right has been based on promises or coercion and if he understands that under Pennsylvania law a penalty-phase jury must render a unanimous verdict.

*Id.* (citing *Commonwealth v. O'Donnell,* 559 Pa. 320, 740 A.2d 198, 213 (1999)) (citations omitted).

In *Commonwealth v. Mallory,* 596 Pa. 172, 941 A.2d 686 (2008), we addressed the issue of ineffectiveness in connection with the validity of a defendant's jury waiver. Although *Mallory* was not decided at the time the parties in the instant matter filed their briefs, it is instructive. In that case, the defendants executed extensive written jury waiver colloquies but did not request on-the-record oral colloquies, and the trial court did not conduct such colloquies. After their direct appeals were unsuccessful, the defendants filed PCRA petitions, each alleging his trial counsel was ineffective for failing to challenge the validity of his jury waiver on the grounds the trial court did not conduct an oral colloquy pursuant to Pa.R.Crim.P. 620. The PCRA court held the absence of such colloquies rendered the waivers invalid as a matter of law and concluded counsel were ineffective. The Superior Court reversed, finding the defendants failed to demonstrate prejudice as discussed in *Commonwealth v. Lassiter,* 554 Pa. 586, 722 A.2d 657 (1998) (Opinion Announcing the Judgment of the Court) (defendants challenging validity of jury waiver must demonstrate outcome of joint trial would have been more favorable if conducted before jury). We accepted review to address the proper analysis of the prejudice prong of the ineffectiveness test in the context of the validity of a jury waiver, as *Lassiter* did not definitively resolve the issue.

In addressing whether the lack of an oral jury waiver colloquy, as contemplated by Pa.R.Crim.P. 620, warranted a presumption of prejudice, we made the following observations:

The essential elements of a jury waiver, though important and necessary to an appreciation of the right, are nevertheless simple to state and easy to understand. "The[ ] essential ingredients, basic to the concept of a jury trial, are the requirements that the jury be chosen from members of the

community (a jury of one's peers), that the verdict be unanimous, and that the accused be allowed to participate in the selection of the jury panel." *Commonwealth v. Williams,* 454 Pa. 368, 312 A.2d 597, 600 (1973); *accord Commonwealth v. Smith,* 498 Pa. 661, 450 A.2d 973, 974 (1982).

\* \* \*

A waiver colloquy is a procedural device; it is not a constitutional end or a constitutional "right." Citizens can waive their fundamental rights in the absence of a colloquy; indeed, waivers can occur by conduct or by implication. . . . Moreover, the absence of an on-the-record colloquy concerning the fundamentals of a trial by jury does not prove, in an absolute sense, that a defendant failed to understand the right he waived by proceeding non-jury. Consider, for example, a criminally-accused lawyer who waives a jury. Or, consider a career criminal defendant with previous, first-hand experience with jury trials. Or, imagine a reasonably intelligent client whose lawyer informed him, off the record, of the three basics of a jury trial. The record colloquy contemplated by Pa.R.Crim.P. 620 serves a salutary prophylactic purpose, as it makes it plain that a jury waiver is knowing and voluntary, and it creates a record in the event of a later, collateral attack upon the waiver. For the same twin reasons, an on-the-record colloquy is a useful procedural tool whenever the waiver of any significant right is at issue, constitutional or otherwise, *e.g.,* waiver of a trial, waiver of the right to counsel, waiver of the right to call witnesses, waiver of the right to cross-examine witnesses, waiver of rules-based speedy trial time limits, etc. But the colloquy does not share the same status as the right itself.

The right to a jury trial in criminal cases, unlike the Rule-based requirement of a waiver colloquy, does implicate constitutional concerns. If this case involved direct governmental denial of an explicit request for a jury—if appellants had demanded a jury and the trial judge said, "No"— appellants would have a valid claim that they were denied their constitutional right to trial by jury. But that is not

the claim presented here. Appellants explicitly waived their rights to a jury, in writing, on the record. Appellants' shared collateral claim (the Lewises have an added burden concerning appellate counsel which we will address below) is that, notwithstanding their explicit written waiver collo-quies, which were attested by their lawyers, the prosecutor and (in two of three cases) the trial judge, those waivers were the product of the ineffectiveness of their trial counsel. Specifically, they allege that their lawyers failed to object when the trial court failed to conduct an on-the-record oral waiver colloquy to supplement the written waivers. If they had been so queried in open court, all three appellants claim, they would have contradicted their written waivers and demanded a jury. This not uncommon my-record-waiver-was-my-lawyer's-fault claim is far removed from the "constitutional, structural" error that would be at issue if a timely jury demand was wrongly denied.

*Mallory,* at 696–97.

We also stressed the importance of recognizing the distinct analysis required when a jury waiver colloquy claim is litigat-ed through the guise of counsel ineffectiveness:

Recognizing that the claim here involves a collateral attack focusing upon the Sixth Amendment right to counsel, and that the collateral attack only indirectly implicates the distinct constitutional right to a jury trial and the Rule-based "right" to an oral waiver colloquy, is paramount to its proper evaluation. Of course, lawyers have an obligation to counsel their clients in conjunction with the waiver of basic rights, including the waiver of a jury; but the mere absence of a record oral waiver colloquy does not automatically prove that a right was relinquished unknowingly or involun-tarily and that the trial lawyer was ineffective for causing the waiver. When a presumptively-valid waiver is collater-ally attacked under the guise of ineffectiveness of counsel, it must be analyzed like any other ineffectiveness claim. Such an inquiry is not resolved by the mere absence of an oral waiver colloquy; instead, the analysis must focus on the totality of relevant circumstances. Those circumstances

include the defendant's knowledge of and experience with jury trials, his explicit written waiver (if any), and the content of relevant off-the-record discussions counsel had with his client. *See Commonwealth v. Allen,* 557 Pa. 135, 732 A.2d 582, 590 (1999) (rejecting *per se* approach and holding that trial court should determine defendant's actual knowledge in guilty plea colloquy context by looking at totality of circumstances to distinguish whether plea was voluntarily, knowingly, and intelligently made); *Commonwealth v. DeGeorge,* 506 Pa. 445, 485 A.2d 1089, 1091–92 (1984) (permitting "consideration of circumstances outside the content of the of-record colloquy in determining the validity of the waiver" when counsel allegedly was ineffective for failing to object to trial court's acceptance of defendant's jury waiver without first conducting on-the-record colloquy); *see also Commonwealth v. O'Donnell,* 559 Pa. 320, 740 A.2d 198, 215–19 (1999) (Castille, J., dissenting) (collecting and discussing cases).

*Id.,* at 698. We then confirmed the propriety of the "totality of the circumstances" approach:

[A]bsence of an oral colloquy alone does not prove that a jury waiver was in fact unknowing or involuntary; rather, the PCRA court must look to the totality of the circumstances ... including the discussions between the lawyers and their clients regarding the jury waiver.... The analysis regarding the underlying merits of appellants' ineffectiveness challenge must be more precise and must account for all relevant circumstances surrounding the waiver.

*Id.,* at 704. Finally, we rejected the argument that collateral jury waiver allegations were among the circumstances in which prejudice may be presumed:

[T]o prove trial counsel ineffective, each appellant must show that his understanding of the [jury] waiver was constitutionally impaired by his lawyer's deficient performance, as well as proof that he would have elected a jury but for his lawyer's performance. Thus, we affirm the *Lassiter* OAJC

238

to the extent it determined that, in circumstances like these, actual prejudice must be shown.

*Id.*, at 702.

▮ Here, unlike *Mallory*, there was an on-the-record oral colloquy; however, *Mallory's* summary of the burden of proof for a defendant who alleges counsel's ineffectiveness in connection with a jury waiver is controlling. Appellant must demonstrate he did not understand what he was waiving; that trial counsel caused his failure to understand; and that, but for counsel's ineffectiveness, he would have insisted upon a jury. He does not even attempt to address this requirement; furthermore, a review of the colloquy under the totality of the circumstances reveals appellant cannot prevail on his claim.

The trial court specifically told appellant: "At [the penalty] hearing, if it is just with a judge, you could have a jury hearing if you decided to go with a jury." N.T. Trial, 10/18/89, at 30. The prosecutor then commented: "You could have a jury who heard the trial of first degree murder also make a decision on the penalties.... Having a trial with the judge here, the judge will make that determination...." *Id.* This comment could be interpreted to mean that if appellant waived a jury at the guilt phase, he automatically did so at the penalty phase, too. The prosecutor later stated, however:

Knowing that that is a possibility, do you still wish to have this judge, *and I am only talking about the death penalty phase here,* that particular phase if we get to that?

\* \* \*

So you are giving up your right [to a jury] as to whether you did it and you are also giving up your right to a jury trial on the decision as to what penalty to impose....

*Id.*, at 31 (emphasis added).

These comments could be interpreted as referring to appellant's waiver of a penalty phase jury as being separate from his waiver of one at the guilt phase; as the dissent notes, the colloquy did include some potentially confusing points.

Read in its entirety, however, the record reflects appellant was informed of the essential requirements under *O'Donnell;* appellant participated in the colloquy, asked questions and conferred with counsel, and indicated he understood the right he was waiving and that his waiver had not been coerced. *See id.,* at 28–36. Specifically, appellant assented when the prosecutor stated, "Just so you know ... you can't say later I wanted a jury on the death penalty[,]" and "You are giving up your right today to have a jury ... make up their mind as to what proper penalty under the law is.... The judge and the judge alone will make that determination." *Id.,* at 33–34. Appellant assented when asked: "[D]o you still wish to have the judge hear this on her own without the jury?" and "You talked with your lawyer and said you understood what I said and want the judge to decide that aspect of it, death penalty phase without a jury." *Id.,* at 34–35. Appellant also assented when the prosecutor explained that if 11 jurors decided appellant should receive the death penalty, "but one of them decided that life imprisonment was proper, you wouldn't get the death penalty." *Id.,* at 35. Appellant assented again when the prosecutor asked, "Knowing that is the right you are giving up for purposes of the death penalty, do you wish for the Court to make that decision and not 12 individual people?" *Id.,* at 36.

█ Appellant and his brother, who was colloquial with him, expressed their decision to waive a jury was motivated by their belief the media tainted the public against them. *See Id.,* at 37–38. Furthermore, trial counsel recalled that prior to trial, he and the prosecutor met with the trial judge, who "wanted to know if this could be worked out" with "a life plea or anything else like that," N.T. PCRA Hearing, 9/8/99, at 22, but the prosecutor refused to accept anything but a plea to death. Trial counsel's recollection was that the trial judge "was absolutely, unconditionally appalled" at the Commonwealth's intransigence, and all members of the defense (both the defendants and their attorneys) agreed, after conferring together, that "our best shot for not getting death in this case was going to be with [the trial judge]." *Id.,* at 22–23.

Trial counsel added he recalled fully explaining the concept of jury waiver to appellant, that he believed waiver of a jury at both phases of the trial was in appellant's best interests, and that all key members of the defense (himself, appellant, appellant's brother, and his brother's counsel) agreed on this point. Trial counsel testified appellant "didn't want a jury in the penalty phase. The penalty phase was exactly what we were scared of. We thought the district attorney's office was so outrageous and [the trial judge] was so upset by what the district attorney's office was doing [in refusing to accept a plea to life imprisonment] that this was his best shot for life." N.T. PCRA Hearing, 9/13/99, at 149–50. Trial counsel testified that to the best of his knowledge and recollection, he had explained to appellant that the jury waiver would mean the trial judge alone would make the decision at the penalty phase. *Id.*, at 177. When asked if he agreed with appellant on the question of jury waiver, trial counsel replied, "Yes. We had long discussions about it." N.T. PCRA Hearing, 9/14/99, at 6–7.

Crucially, at no time during the PCRA hearings, which ultimately stretched over several months, did appellant testify to contradict or challenge trial counsel's testimony, or even to claim he did not understand what was he was waiving. Instead, PCRA counsel premised the claim upon the waiver colloquy alone. *See* N.T. PCRA Hearing, 12/5/00, at 7–22. The record and uncontradicted testimony, however, reveal the jury waiver was motivated precisely by a fully-informed desire that the trial judge preside over the penalty phase. The strategy, as so identified, obviously was reasonable.

Appellant has not demonstrated, beyond a bald allegation of prejudice, that trial counsel's ineffectiveness caused him to waive a jury at the penalty phase. *See Harrington v. Richter*, — U.S. ——, 131 S.Ct. 770, 790–92, 178 L.Ed.2d 624 (2011) (if all that can be shown is "merely that the defense strategy did not work out as well as counsel had hoped," ineffectiveness claim should not be granted). Appellant's brief merely states, without support in case law or the record, he suffered prejudice because of allegedly erroneous and confusing statements made during the colloquy. He does not point to any deficient

performance on the part of trial counsel, and, as there was a reasonable basis for trial counsel's strategy, the claim regarding appellate counsel's ineffectiveness is meritless, and there is no need to remand for further development. *McGill*, at 1025.

*Whether appellant's waiver of mental health testimony was not knowing, intelligent, and voluntary.*

■ Trial counsel planned to call Dr. Allan Tepper, a psychologist who evaluated appellant the night before the penalty phase, to present mitigating mental health testimony. However, immediately after Dr. Tepper arrived in court, appellant informed counsel he did not wish to have this expert testify. N.T. Penalty Phase, 10/27/89, at 669. The trial court colloquied appellant to establish the voluntariness of his decision to forego Dr. Tepper's testimony, and was satisfied such decision was knowing and informed. *Id.*, at 669–70. Appellant claims his waiver of Dr. Tepper's mental health testimony was not valid because trial counsel did not retain this expert until the eve of the penalty phase, did not provide adequate background information about appellant to this expert, and did not explain to appellant the substance of this expert testimony and its value as mitigating evidence. Appellant contends although appellate counsel argued on direct appeal that the trial court abused its discretion in permitting this waiver, appellate counsel failed to proffer facts showing why the waiver was invalid, *i.e.*, trial counsel's inadequate preparation.[17]

On direct appeal, this Court concluded the trial court did not abuse its discretion in refusing to reopen the penalty phase so that Dr. Tepper could testify, as appellant's waiver was voluntary, and he failed to present any information regarding the nature of the proposed testimony or the mitigating circumstances to which it would have been relevant. *See Birdsong*, at 33–34. Appellant essentially contends his failure to present the information necessary to prevail on this claim

17. The PCRA court held this issue was previously litigated; however, because appellant has now raised it in the context of appellate counsel's ineffectiveness, the issue is distinct from the one raised on direct appeal and is thus reviewable. *See Collins*, at 573.

was the result of trial counsel's ineffectiveness in preparing the expert and in conveying to appellant the import of this witness's testimony. However, trial counsel testified he stressed the importance of Dr. Tepper's testimony to appellant, telling him without this expert's testimony, he would probably get the death penalty; trial counsel stated he "absolutely, unconditionally, tried to get him to let Dr. Tepper testify." N.T. PCRA Hearing, 9/13/99, at 128; see also id., at 126–35.[18] The only reason appellant gave counsel for not wanting Dr. Tepper to testify was he was afraid Dr. Tepper would make him "look dumb." Id., at 123. Despite trial counsel's strenuous attempts to convince appellant otherwise, he failed to do so; appellant's refusal to heed counsel's advice does not make counsel ineffective. Thus, the underlying claim of trial counsel's ineffectiveness fails, and remand for further development of this claim with respect to appellate counsel's stewardship is unnecessary. McGill, at 1025.

*Whether trial counsel was ineffective for failing to investigate, prepare, and present mitigating evidence in support of a diminished capacity defense at trial and as mitigation at the penalty phase.*

Appellant claims trial counsel was ineffective for failing to investigate and present evidence regarding his drug addiction, traumatic and abusive childhood, and mental health issues such as PTSD and drug-induced psychosis. Appellant asserts the evidence of his mental health issues and drug abuse would have supported a diminished capacity defense in the guilt phase;[19] he further asserts he would not have waived a jury at the guilt phase had he known a diminished capacity defense

18. There was conflicting testimony concerning whether counsel gave Dr. Tepper appellant's background information prior to the eve of sentencing, cf. N.T. PCRA Hearing, 9/13/99, at 116 and N.T. PCRA Hearing, 1/5/00, at 12–14.

19. As discussed supra, in conjunction with our disposition of appellant's guilt phase issues, appellant's claim that trial counsel should have presented evidence of his drug abuse and mental health issues in the guilt phase is meritless, and remand for development of an ineffectiveness claim pertaining to appellate counsel is thus unnecessary. McGill, at 1025.

was available.[20] Finally, he contends the evidence of his addiction, dysfunctional childhood, intellectual deficiencies, and mental illness should have been presented in the penalty phase in support of the § 9711(e)(2), (e)(3), and (e)(8) mitigators.

At the penalty phase, trial counsel presented the testimony of Aisha Johnson, the mother of appellant's two-year-old son, and Altrecia Berry, Johnson's mother. Berry testified appellant was a good person and a good father; she had never known him to be violent. N.T. Penalty Phase, 10/27/89, at 660. Johnson testified appellant was a good father, but that he had a drug problem; when he was not high, he was nice and gentle, but when he was high, he became violent and nasty. *Id.*, at 663–66. Trial counsel planned to call Dr. Tepper, but as previously noted, appellant indicated he did not want this expert to testify. *Id.*, at 669. Trial counsel pled for appellant's life in his closing statement, emphasizing appellant's drug use in support of the § 9711(e)(3) mitigator, and pointing out appellant had been offered no choice other than to enter a guilty plea to a death sentence. *Id.*, at 676. Trial counsel also contrasted other capital cases where the defendants had received life sentences, and argued vehemently for a life sentence. *Id.*, at 677–79.

At the PCRA hearing, appellant presented the testimony of experts, friends, and family, who he asserted should have been called at the penalty phase, as well as that of trial and appellate counsel. Specifically, appellant's mother, brothers, and sister testified about appellant's dysfunctional family history, which included a traumatic fire he witnessed at a young age, physical and verbal abuse by their alcoholic father, poverty, and involvement with gangs and drugs by appellant and his brothers. N.T. PCRA Hearing, 1/5/00, at 149–79, 205; N.T. PCRA Hearing, 1/6/00, at 54–79, 178, 186–87, 190–91. Appellant's childhood friend testified to these same facts, and specifically mentioned appellant suffered from hallucinations and suffered a head injury in a gang fight, after which his personality changed. *Id.*, at 206–08, 211–15, 216–18. A former

20. This claim is addressed *supra,* n. 13.

girlfriend of appellant's, who was also the mother of one of his children, testified appellant was sweet when she first knew him, but had changed; however, he was very supportive of their daughter. *Id.,* at 108–10. She stated appellant appeared to be high when she saw him shortly after the murder, and she confirmed his dysfunctional upbringing and the fire he witnessed as a child. *Id.,* at 113, 117–18, 121–22. Appellant's niece testified to his good character, stating he was like a father to her. N.T. PCRA Hearing, 1/5/00, at 140–43. All of these witnesses, except appellant's mother, stated they would have testified at the penalty phase, but they were not contacted. *Id.,* at 144–45; N.T. PCRA Hearing, 1/6/00, at 81–82, 124, 194, 222. However, the testimony of these witnesses also revealed family communication concerning appellant's incarceration and upcoming trial was not always ongoing, as family members were living in different states, one brother was incarcerated, and appellant had distanced himself from them. N.T. PCRA Hearing, 1/5/00, at 184–91, 209; N.T. PCRA Hearing, 1/6/00, at 100–01, 196–97.

Appellant's former girlfriend, Aisha Johnson, one of the two witnesses called at the penalty phase, testified the only phone contact she had with counsel prior to the penalty phase concerned a matter pertaining to appellant's property. She stated counsel's investigators never met with or called her, but admitted these events were over ten years ago, and she did not recall whether she was contacted. *Id.,* at 149–50, 167–68. According to Johnson, counsel did not speak to her about her penalty phase testimony until right before it began, and he only spoke with her for five minutes, not asking her anything about appellant's upbringing or his change of behavior when he was on drugs. *Id.,* at 148–49, 151, 153, 162. She said appellant was different when he was on drugs. *Id.,* at 169.

Trial counsel testified he had been practicing law for nine years when he was appointed to represent appellant, and he did everything he could possibly do to defend appellant. N.T. PCRA Hearing, 9/8/99, at 39; N.T. PCRA Hearing, 9/13/99, at 36. He worked with two investigators to gather information in support of appellant's defense; they were in touch with him

several times a day, apprising him of their progress. *Id.*, at 34–36. Although the investigators spoke to appellant or Aisha Johnson daily by phone, seeking names of potential penalty phase witnesses, many of these potential witnesses refused to help. N.T. PCRA Hearing, 9/8/99, at 26. Counsel stated appellant's mother was contacted, but refused to come to appellant's trial, even when counsel spoke with her on the phone. *Id.*, at 28; N.T. PCRA Hearing, 9/13/99, at 41–42. Counsel could not recall if he contacted appellant's father, but thought his investigators had. N.T. PCRA Hearing, 9/8/99, at 24; N.T. PCRA Hearing, 9/13/99, at 43. Counsel did not know if the investigators spoke with appellant's siblings. *Id.*, at 46–48. Counsel could not recall with certainty if he obtained appellant's school and correctional records, but thought Dr. Tepper had reviewed them. *Id.*, at 51, 111, 113, 116.

Regarding appellant's drug abuse, counsel thought Aisha Johnson, the mother of appellant's son, was the best witness to testify about appellant's personality changes when he was under the influence of drugs. *Id.*, at 87. Counsel repeatedly stated he did not believe appellant's drug use was at issue, and he did not present additional evidence regarding this because there was no dispute appellant had a severe drug problem and was under the influence of drugs most of the time; the Commonwealth did not contest this evidence. *Id.*, at 65–66, 69, 79–80, 83, 90, 104; N.T. PCRA Hearing, 9/14/99, at 9. Additionally, Dr. Tepper would have testified about appellant's drug use. N.T. PCRA Hearing, 9/13/99, at 66–67.

Counsel further testified he chose Dr. Tepper as the key witness for the penalty phase because he had a long-standing relationship with this expert and believed him to be the best witness; the Commonwealth would not cross-examine him extensively, as it used him to train prosecutors for capital cases, and Dr. Tepper was not only a psychologist but also an attorney, and thus aware of the issues, case law, and death penalty statute's requirements in relation to his testimony. *Id.*, at 118–19. In addition to testifying about appellant's history of drug abuse, Dr. Tepper would have testified appellant had a low IQ. *Id.*, at 122. Counsel testified Dr. Tepper

was present and ready to testify at the penalty phase, and appellant knew the importance of this testimony; counsel explained to appellant that without it, he would most likely get the death penalty. *Id.,* at 62, 126, 128, 184; N.T. PCRA Hearing, 9/14/99, at 45–46. However, appellant suddenly objected, telling counsel he did not want Dr. Tepper's testimony presented because it would make him appear stupid. N.T. PCRA Hearing, 9/13/99, at 123, 126–28. Counsel "absolutely, unconditionally, tried to get him to let Dr. Tepper testify[,]" *id.,* at 128, but could not persuade appellant to change his mind. Finally, counsel testified that throughout his representation of appellant, he had no problem talking to appellant, and they had no problem understanding each other when discussing whether to waive a jury. *Id.,* at 144, 146.

One of the investigators who worked with trial counsel confirmed appellant's mother was contacted but refused to come for trial, the majority of people contacted to be character witnesses for the penalty phase did not want to get involved, she spoke to appellant daily and they never had problems understanding each other, and appellant was very active in the preparation of his defense and understood what was at stake. N.T. PCRA Hearing, 1/4/00, at 21–22, 85–88.

One of appellant's PCRA counsel testified that in conducting her investigation for the PCRA proceedings, she was told by appellant's family that the defense investigators never contacted them; the investigator she spoke with said they had not contacted the family, as trial counsel would have been the one to do that. N.T. PCRA Hearing, 1/7/00, at 60–61.

Dr. Michael Scott Maher, a forensic psychiatrist who evaluated appellant for the PCRA hearing, testified he reviewed appellant's school and prison records, pre-sentence investigations from prior offenses, affidavits from friends and family, police reports, and Dr. Tepper's notes, and after evaluating appellant, concluded appellant's PTSD and polysubstance abuse at the time of the offense impaired appellant's capacity to conduct his behavior according to law, as well as impaired his capacity to understand the nature of his behavior and its wrongfulness. N.T. PCRA Hearing, 1/4/00, at 100–07.

Dr. James Larsen, a forensic psychologist who evaluated appellant for the PCRA hearing, testified that after he viewed the same materials as Dr. Maher and met with appellant, he concluded appellant was a polysubstance abuser with PTSD and a borderline IQ; he further opined these conditions, combined with drug-induced psychosis at the time of the offense, established the § 9711(e)(2) and (e)(3) mitigators, as Dr. Maher had concluded. N.T. PCRA Hearing, 1/5/00, at 49–53.

Dr. Tepper testified he evaluated appellant for three hours. Although he conceded he had limited time to conduct his evaluation with limited background information (he did not remember receiving background documents from counsel), he recalled being familiar with the case's facts and circumstances. *Id.*, at 7, 10, 12–13, 29–30. He testified he would not have independently requested appellant's juvenile and prison records. *Id.*, at 13–14. He noted appellant's low IQ and drug use were apparent, and explained his practice was not to ask for the defendant's version of the crime if counsel said not to; here, he did not recall counsel instructing him not to, so he probably would have asked appellant, and it was appellant's wish not to speak about it. *Id.*, at 18, 22–23. He did not diagnose appellant as having PTSD, but acknowledged his awareness of his dysfunctional upbringing. *Id.*, at 26, 28.

The Commonwealth presented the testimony of Dr. John Sebastian O'Brien, a forensic psychiatrist who reviewed appellant's records, the affidavits and reports of Drs. Maher, Larsen, and Tepper, and the affidavits of appellant's family and friends. N.T. PCRA Hearing, 1/7/00, at 107–08. Dr. O'Brien was used as a consultant only to opine whether the records provided a basis for the other doctors' conclusions, and he did not examine appellant.[21] He acknowledged appellant had a

21. In a one-sentence argument, appellant contends Dr. O'Brien should not have been permitted to testify because he never met or evaluated appellant; however, it was made clear at the PCRA hearing that Dr. O'Brien was testifying as a consultant to review the findings of Drs. Maher and Larsen, in order to rebut their testimony. N.T. PCRA Hearing, 1/14/00, at 23, 25, 35, 37. His opinion was that, based on his review of appellant's records only, there was no basis for certain

borderline IQ and a mixed substance abuse disorder, but noted appellant's low IQ did not prevent him from being a fully functioning adult who ran different businesses and owned several properties and vehicles. *Id.*, at 112, 115. Dr. O'Brien disagreed with the finding that appellant suffered from PTSD; he opined appellant had PTSD as a child, but this disorder had resolved itself by the time he reached adulthood. *Id.*, at 113–16. Dr. O'Brien further disagreed with the conclusion appellant suffered from a substance-induced psychotic disorder; he opined the "difficulties" appellant experienced as a result of his substance abuse were manifestations of voluntary substance intoxication, not psychosis. *Id.*, at 116–18, 129. Finally, Dr. O'Brien concluded appellant would have been able to understand the wrongfulness of his conduct and to conform his conduct to the law's requirements at the time of the crime, and he had not suffered from an extreme psychological or emotional disturbance, so the § 9711(e)(2) and (e)(3) mitigators were not established. *Id.*, at 143–45.

In arguing trial counsel was ineffective for failing to investigate and present the mitigating evidence summarized above, appellant relies on *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), which held capital counsel is obligated to thoroughly investigate and prepare mental health and other mitigating evidence, *Williams*, at 396, 120 S.Ct. 1495; counsel cannot meet this obligation by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins*, at 524, 123 S.Ct. 2527. In *Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294 (2008), this Court noted:

Under prevailing constitutional norms as explicated by the United States Supreme Court, capital counsel has an obligation to pursue all reasonable avenues for developing mitigating evidence. Counsel must conduct a thorough pretrial investigation, or make reasonable decisions rendering

conclusions the other experts reached; he gave no opinion on their findings based on their evaluations of appellant. Furthermore, appellant did not raise this issue in his PCRA petition; therefore, it is waived. *See* Pa.R.A.P. 302(a).

particular investigations unnecessary. Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. In undertaking the necessary assessment, courts are to make all reasonable efforts to avoid distorting effects of hindsight. Nevertheless, courts must also avoid *"post hoc* rationalization of counsel's conduct."

*Id.,* at 303–04 (citations and footnote omitted).

In *Bobby v. Van Hook,* —— U.S. ——, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), the United States Supreme Court further clarified what *Strickland* requires regarding the investigation and preparation of penalty phase mitigating evidence:

The Sixth Amendment entitles criminal defendants to the " 'effective assistance of counsel' "—that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." That standard is necessarily a general one. . . . Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.

*Id.,* at 16 (citations omitted).

*Williams* and *Wiggins* did not establish a new federal constitutional standard by which to measure counsel's stewardship in preparing for the penalty phase; they simply applied *Strickland's* well-settled ineffectiveness standard to later cases involving the specific question of counsel's duty to investigate mitigating evidence in a capital case. This standard is a general one, and must be flexible enough to consider the prevailing professional norms at the time of counsel's performance. *See Strickland,* at 689, 104 S.Ct. 2052 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

 Viewing trial counsel's penalty phase investigation under the prevailing professional norms at the time of his stewardship, we cannot conclude appellant was prejudiced by counsel's performance. *See Rollins*, at 441 (ineffectiveness claim may be denied by showing petitioner's evidence fails to meet single one of three prongs for claim). Although the only mitigating evidence actually presented was that appellant had a drug problem but was otherwise a good person, the record supports the PCRA court's conclusion that appellant's family—who would have testified about his dysfunctional, abusive upbringing—was not willing to appear on behalf of appellant, and trial counsel's efforts to present expert mental health evidence were thwarted by appellant's refusal to permit such testimony. Appellant's family testified they would have been penalty phase witnesses but were not contacted; counsel and his investigator testified effort was made to contact them, but no one wanted to get involved. The PCRA court, as the sole arbiter of credibility, found the latter testimony credible, and we cannot disturb this finding. *See Abu–Jamal*, at 99 (credibility issues are within sole domain of trier of fact). Accordingly, trial counsel was not ineffective for failing to present testimony by appellant's family.

 Regarding Dr. Tepper, we have already determined appellant voluntarily chose to forego having this expert testify. Therefore, even if the amount of time for evaluation and background information trial counsel gave Dr. Tepper was not reasonable, appellant cannot demonstrate he was prejudiced by counsel's stewardship. Despite appellant's claim to the contrary, his decision to preclude Dr. Tepper's testimony was not motivated by a perception that this expert was ill-prepared or conducted an inadequate assessment; his choice was driven by his desire not to have his low intelligence revealed, *see* N.T. PCRA Hearing, 9/13/99, at 123, a fact which was evident in appellant's school and correctional records. According to trial counsel, had Dr. Tepper testified, he would have brought to light not only appellant's limited intelligence, but also his family background and its impact on his development. Although Dr. Tepper did not agree with Drs. Maher and Lar-

sen's diagnosis of PTSD and substance-induced psychosis, it is doubtful the information in appellant's school and correctional records would have altered Dr. Tepper's conclusion. The school records reveal appellant's severe emotional, disciplinary, and academic problems, but do not indicate any psychological disorders or suggest counseling other than placement in special education. The correctional records reflect low intelligence, immaturity, substance abuse, poor impulse control, and aggressive behavior, but specifically state, "There are no indications of any psychotic thought processes in this individual. Diagnostically he would appear to be a Personality Disorder, Passive–Aggressive Type." 1978 Mental Health Evaluation by Marvin Strauss, Ph.D., Defendant's Exhibit 28; *see also* 1978 Pre-sentence Investigation by James Donaldson, Defendant's Exhibit 28. Thus, we cannot say trial counsel's investigation and preparation of mental health mitigating evidence, even if unreasonable, prejudiced appellant. As appellant's underlying claim of trial counsel's ineffectiveness fails, remand for further development of this claim concerning appellate counsel is unwarranted. *McGill*, at 1025.

*Whether appellant's prior juvenile adjudications were improperly considered as prior felony convictions under aggravating circumstance 42 Pa.C.S. § 9711(d)(9).*

Appellant claims trial counsel was ineffective for stipulating to three juvenile adjudications [22] which the Commonwealth used to support the § 9711(d)(9) aggravator (defendant has significant history of felony convictions involving use or threat of violence to person); he argues the law at the time of his trial did not permit the use of juvenile adjudications in adult criminal proceedings, and the use of these adjudications violated his due process rights and constituted an *ex post facto* violation.[23]

At the time of appellant's trial, the Juvenile Act provided:

**22.** Trial counsel stipulated to two adjudications for robbery and one for burglary; he also stipulated to a 1987 conviction for robbery when appellant was an adult.

**23.** Appellant did not raise the *ex post facto* issue in his PCRA petition; therefore, it is waived. *See* Pa.R.A.P. 302(a). Even if properly pre-

§ 6354. Effect of adjudication

(a) General rule.—An order of disposition or other adjudication in a proceeding under this chapter is not a conviction of crime. . . .

(b) Effect in subsequent judicial matters.—The disposition of a child under this chapter may not be used against him in any proceeding in any court other than at a subsequent juvenile hearing, whether before or after reaching majority, except:

> (1) in dispositional proceedings after conviction of a felony for the purposes of a presentence investigation and report; or

> (2) if relevant, where he has put his reputation or character in issue in a civil matter.

42 Pa.C.S. § 6354.[24]

*Commonwealth v. Baker*, 531 Pa. 541, 614 A.2d 663 (1992), addressed the issue of whether juvenile adjudications could be introduced to support the § 9711(d)(9) aggravator under the former version of the Juvenile Act, which was in effect when appellant was tried. This Court held such adjudications were admissible as convictions for purposes of capital sentencing, because such sentencing requires an analysis of the defendant's entire background, character, and record, *id.*, at 675–76, and we have reiterated this holding. *See Commonwealth v. Moore*, 594 Pa. 619, 937 A.2d 1062, 1068 (2007); *Carson*, at 274–75. Thus, appellant's claim is meritless,[25] and remand for

served, this Court rejected an identical challenge in *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 275–76 (2006).

**24.** Section 6354 was subsequently amended in 1995 to permit the use of delinquency adjudications in a criminal proceeding where evidence of such offenses would be admissible if they were committed by an adult. *See* 42 Pa.C.S. § 6354(b)(4).

**25.** Furthermore, any "error in submitting an aggravating circumstance is harmless where the jury finds multiple aggravators and no mitigators[,]" *Carson*, at 275 (citing *Commonwealth v. Lester*, 554 Pa. 644, 722 A.2d 997, 1006 n. 15 (1998)), as was the case here. The trial court found both the § 9711(d)(9) and (d)(11) aggravators proven, and no mitigating circumstances; thus, the outcome at sentencing would have been death even absent the § 9711(d)(9) aggravator. *See* 42 Pa.C.S.

further development of this claim with respect to appellate counsel is unwarranted. *McGill*, at 1025.

## PCRA Proceedings

 Appellant asserts the PCRA court impeded his right to present material evidence when it refused to issue certificates of materiality to subpoena two out-of-state Commonwealth trial witnesses; he claims these witnesses would have described the Commonwealth's favorable treatment of its witnesses, thus showing their bias and supporting his *Brady* claim. However, PCRA counsel admitted these witnesses would not recant their trial testimony against appellant, N.T. PCRA Hearing, 10/26/99, at 32–33, and both witnesses appeared unwilling to cooperate with the defense, *id.*, at 34–35; therefore, the PCRA court concluded their purported testimony that they were given housing and transportation to Maryland "would not make a substantial difference in the jury's finding of credibility as to these witnesses." *Id.*, at 42. Thus, this evidence was not material, as it would not have changed the outcome of the case; we perceive no error in this ruling.

 Appellant claims he was prejudiced by the Commonwealth's unreasonable delay in responding to his PCRA petition; he asserts two witnesses died and another became unavailable between the time he filed his petition and the PCRA hearing. Appellant asserts his father, who died prior to the hearing, would have testified concerning mitigation evidence of appellant's dysfunctional childhood that should have been presented at the penalty phase, as well as testified in support of appellant's claim the trial judge was biased against him and his family. Appellant asserts his brother, Michael, who became disabled prior to the hearing and was thus unavailable, would have testified about mitigating evidence of appellant's childhood and would have admitted it was he, not appellant, who committed the rape. Appellant asserts the trial judge, who also died prior to the hearing, would have been a relevant witness concerning the bias claim.

§ 9711(c)(1)(iv). Thus, appellant fails to demonstrate he was prejudiced by the inclusion of the § 9711(d)(9) aggravator.

The testimony of appellant's father would have been cumulative of other family members' testimony at the PCRA hearing. Thus, appellant was not prejudiced by the delay he attributes to the Commonwealth, during which time this purported witness died. Appellant's brother, Michael, was called as a trial witness, but exercised his right against self-incrimination. *Birdsong*, at 35 (citing N.T. Trial, 10/26/89, at 578–79). As previously noted, this Court concluded on direct appeal that this witness's testimony would not have been helpful to appellant; many eyewitnesses who knew appellant identified him as the shooter. *Id.* Thus, this issue concerning appellant's brother's purported testimony was previously litigated; as appellant does not couch it in terms of ineffectiveness, no further review is appropriate.

Appellant's claim the trial judge's testimony would have established her bias rings hollow in the face of the trial record; the claim was based on the fact the trial judge presided over juvenile proceedings involving appellant's siblings years before appellant's trial. As previously noted, the trial judge was not required to recuse herself on this basis, and the record reflects she gave appropriate consideration to appellant's recusal motion. Thus, appellant's claims of prejudice by the Commonwealth's delay in filing its response to his PCRA petition are baseless.[26]

Finally, appellant claims the PCRA court displayed bias against him by repeatedly interrupting PCRA counsel, refusing to allow counsel to lodge full objections, accusing counsel of stalling, commenting on the credibility of a witness, commenting about the proceedings, interfering with PCRA counsel's questioning of witnesses, and permitting expert testimony by unqualified Commonwealth witnesses. *See* Appellant's Brief, at 18–21 (citing N.T. PCRA Hearing, 1/5/00, at 62; N.T. PCRA Hearing, 1/6/00, at 15; N.T. PCRA Hearing, 9/13/99, at 64; N.T. PCRA Hearing, 10/26/99, at 45; N.T.

**26.** Appellant overlooks the fact the PCRA hearing was continued several times due to the illness of the trial judge who was initially assigned to hear his PCRA claims. *See* Commonwealth's Post–Hearing Brief, 10/13/00, at 4–5.

PCRA Hearing, 1/7/00, at 16; N.T. PCRA Hearing, 1/14/00, at 3–6). Appellant claims these instances entitle him to a new hearing before a different judge.

Appellant overlooks the fact that many of the PCRA court's comments were made in response to PCRA counsel's repeated attempts to circumvent court rulings and ask redundant questions. A court's expression of frustration with counsel's behavior does not evidence a settled bias which would warrant recusal. *See Abu–Jamal*, at 89–90. Furthermore, "[a]dverse rulings alone do not ... establish the requisite bias warranting recusal, especially where the rulings are legally proper." *Id.*, at 90 (citations omitted). Our review of the record reveals no instance where the PCRA court's frustration impaired its ability to preside impartially; therefore, appellant is not entitled to relief.

## *Conclusion*

Having found appellant is not entitled to relief on his claims, we affirm the order of the PCRA court denying his petition for collateral relief.

Order affirmed; jurisdiction relinquished. The Prothonotary is directed to transmit the record to the Governor pursuant to 42 Pa.C.S. § 9711(i).

Justices BAER, McCAFFERY and ORIE MELVIN join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a dissenting opinion in which Justice TODD joins.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion, subject to the qualifications I express in Part II below, addressing points made by Mr. Justice Saylor to which the Majority does not respond. However, I write primarily to address the *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) remand, since the presence of that additional issue, which was ultimately

abandoned, caused substantial delay in the disposition of this appeal, and the circumstances here speak to broader issues of delay in cases where the Federal Defender has volunteered itself into state collateral proceedings.

Appellant, like so many capital defendants who appear before this Court on PCRA[1] appeals, is represented by federally-financed volunteer counsel associated with the Philadelphia Federal Defender, his primary lawyer being Billy H. Nolas, Esq. The Federal Defender burdened both the PCRA court and this Court with typically indiscriminate and prolix pleadings in this case, a case involving a **bench** trial where the evidence of guilt for appellant's savage crimes—including two murders, the brutal rape and sodomization of a teenage girl, and the serious wounding of six other victims—was overwhelming. Not surprisingly, none of appellant's claims goes to his guilt or innocence.

Appellant filed his initial PCRA petition in April 1997. That petition was 154 pages long and lodged sixteen primary claims. After the PCRA court dismissed the petition on April 11, 2001, counsel appealed and filed a Pa.R.A.P. 1925(b) statement, listing twenty-nine questions for review, including "[w]hether all prior counsel (including trial and appellate counsel) provided ineffective assistance insofar as they failed to investigate, develop, and present the issues in this case?" Counsel ultimately filed a 90–page principal brief, which was effectively much longer since it included 83 single-spaced footnotes, and counsel decided not to mention the trial facts. Counsel raised ten principal issues and numerous sub-issues. Counsel later added a claim that his client was mentally retarded and therefore was ineligible for execution under *Atkins*.

–I–

The pendency of the *Atkins* claim delayed this appeal for years, as the Majority details. Ultimately, this Court was forced to remand the matter on August 20, 2007, for the

1. Post Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq.*

PCRA court to determine the *Atkins* merits. Sixteen months later, however, on December 12, 2008, the PCRA court entered an order, which reads as follows:

> Defendant withdraws his *Atkins/Miller* claim (against advice of counsel). Defendant also withdraws all claims with regard to conflict of interests (with present counsel) and ineffectiveness (of present counsel) and wishes his appeals to proceed with current counsel on all other issues already presented.
>
> This Court having no further jurisdiction, the case is sent back to the Supreme Court for further proceedings.

Given the delay occasioned by the pendency of the *Atkins* claim in this case, ongoing concerns with delay in capital cases generally, and what now appears to be a recurring issue of *Atkins* delay in Defender cases,[2] the circumstances of the withdrawal here require consideration.

First, the transcript below reveals that the *Atkins* claim was not withdrawn over the objection of counsel. Rather, Attorney Nolas represented to the court that withdrawal was "not the decision I would make," but since appellant wanted the claim to be withdrawn, and had so "instructed" counsel, "therefore, we would agree with him to withdraw the claim relating to mental retardation." N.T. 12/12/08, 4–5. Query: even if the client is embarrassed by an *Atkins* claim, or is set against it for some other reason, since the claim is the ultimate penalty phase winner, involving death eligibility under the Eighth Amendment, how can a lawyer withdraw such a claim, if arguably meritorious? Which raises the question: was this *Atkins* claim colorable, or was it baseless all along?[3] Here is what the record reveals.

**2.** *See Commonwealth v. Spotz*, 18 A.3d at 340–42, 345–47 (Pa.2011) (reargument pending) (Castille, C.J., joined by McCaffery, J., concurring), (discussing *Atkins* delays in *Commonwealth v. Bracey*, 604 Pa. 459, 986 A.2d 128 (2009) and *Commonwealth v. Porter*, 557 CAP (pending)).

**3.** Many courts, including this one, have recognized that *Atkins* claims are particularly susceptible to, and invite, manipulation. Justice Scalia noted the problem in his dissent in *Atkins:* "One need only read the definitions of mental retardation adopted by the American Association

Before the *Atkins* hearing was held, in September of 2008, appellant, acting *pro se*, sent a letter to the PCRA court (Exhibit C–2 in the PCRA hearing) and two motions (Exhibits C–1 and C–3).[4] The motions sought (1) to remove counsel and (2) to proceed *pro se* and to withdraw the *Atkins* claim, respectively. The court forwarded copies of the letter and the motions to defense counsel and the Commonwealth. N.T. 12/12/08, at 9. Appellant's letter to the PCRA court detailed the reasons why he was upset with his counsel for pursuing the *Atkins* claim. Appellant began by asking the judge for direction on how to file a misconduct complaint against the Federal Defender. He then outlined his complaint concerning the Defender's pursuit of the *Atkins* claim with a remarkable level of detail, as follows (verbatim):

> Lawyers like Billy Nolas, Pa. bar No ... and David Wycoff, Pa. bar No. ... they treat us black people like we are a bunch of mental retarded here on Death Row. every black inmate case they represent have a mental retardation issues please investigate the records for yourself. all black is not dumb or stupid or retarded. we just didn't have opportunity as other had in life. when a black death row inmate disagree with the lawyer they automatic turn there back on us. this don't happened with the white inmate on death row. if a black inmate disagree with Mr. Nolas and Mr. Wycoff

on Mental Retardation and the American Psychiatric Association ... to realize that that the symptoms of this condition can readily be feigned. And whereas the capital defendant who feigns insanity risks commitment to a mental institution until he can be cured (and then tried and executed), ... the capital defendant who feigns mental retardation risks nothing at all." 536 U.S. at 353, 122 S.Ct. 2242 (Scalia, J., joined by Rehnquist, C.J. and Thomas, J., dissenting) (citations omitted); *see also Commonwealth v. Vandivner*, 599 Pa. 617, 962 A.2d 1170, 1187–88 (2009) (quoting with approval trial court's recognition that "[a] second rationale for the 'age of onset' requirement [in the test for mental retardation] is to ensure that defendants cannot feign mental retardation after being charged with a capital crime."); *accord, e.g., State v. Grell*, 212 Ariz. 516, 135 P.3d 696, 702 (2006) (*Atkins* claimant "has significant motivation to attempt to score poorly on IQ test"); *Bowling v. Commonwealth*, 163 S.W.3d 361, 376 (Ky.2005) (reality of facing death penalty can cause scores to be "significantly skewed" by depression, tension, anxiety, and motivation to malinger).

4. The letter is dated September 11, 2008, and marked received by the trial court on September 17th.

Concerning mitigating penalty phase issues or they want you to plea guilt to mitigation issues for a life sentence in prison. or to say I am mental retarded even when you tell then you are not tell me how a person like me come on death row and become retarded when I own and operation a Real State office and have own many of property, and a grocery Store in the Philadelphia area. they will get very angry at you. they will not response to your legal mail will go in the trash. if you look at my appeal docket sheet Wycoff is the first one. the lawyer will even go so far as not to tell you if Pennsylvanian Supreme Court make a big ruling or a decision in your case this is life or death they are playing with. the only way the black inmate know is when the state sign our death warrant this is not right. as you well aware Capital Case have only 90 days before there warrant is sign this do not happened to white inmate they know immediate about there case.

The problem is the lawyers visit my whole family in Atlanta Georgia and use a intimidated tactic on my old mother and told them the state is planed on execution your son soon, if your family do not help and testify this is the only way to save Ralph life. you must come to court and testify that your son was always slow mental and some what retarded growing up.

Billy Nolas purposely put on perjure testimony in court when he scared my family into falsify testify that I was retarded, my family will come back to court and testify under oath the lawyer told them to lie and help save my life. also the lawyer told me they set me up with appointment to see a Dr. Michael Scott Maher, psychiatrist from Florida, the lawyer told me when I see him pretend and act like I am mental slow and retarded for Dr. Moher, and act like I can't read or write basic act dumb to the Doctor. I am willing to testify to this in court and as well my whole family, also I am willing to let the State or Commonwealth psychiatrist to see me and visit me any time.

My questing is what avenue can I take to avoid being abuse and mistreated I been abuse all my life by attorneys I

am tired of it. do you have any form to fill out, I am requesting a full investigation on the State and Federal level.

At the *Atkins* withdrawal hearing on December 12, counsel withdrew the *Atkins* claim and appellant was questioned to determine whether he understood and agreed with the decision to withdraw. Appellant also withdrew his complaints about the Defender. Notably, however, appellant never disavowed any of the factual representations he had made, and Attorney Nolas said only that appellant's letters "speak for themselves" and that the Defender "would never contradict something that a client says." N.T. 12/12/08, at 12–13. Appellant stated that his complaints about counsel "was sort of like in-house complaints ... but now, now I am satisfied with what they done so far"; appellant then stated that he "withdrew" the complaint, and he would "rather" have Attorney Nolas represent him. *Id.* at 13–15. The Commonwealth attempted to examine appellant on the representations in the letter, which suggested both a conflict of interest and serious misconduct upon the part of the defense in attempting to manufacture a false *Atkins* claim. The Commonwealth was cut off by an objection by Attorney Nolas, which the court ultimately—and unfortunately—sustained.

This is a very serious matter. This case has literally been delayed for years based upon an *Atkins* claim that was posed by the Federal Defender as if it had merit, which was then withdrawn by counsel immediately after the Defender's client complained to the trial court, not just that he disagreed with pursuing the claim, but that it was a sham. I realize that, given that the court sustained Attorney Nolas's objection, there have been no factual findings below concerning the accuracy of appellant's allegations of lawyer misconduct, and thus, notwithstanding the remarkable level of detail, appellant's letter may have contained a multitude of falsehoods. But, there is something questionable here which suggests that, even if there was not an active subornation of perjury, there was never a colorable *Atkins* claim. What is not subject to question is that a substantial delay was injected into the case

by the Defender's pursuit of the dubious issue. The fact of delay in capital PCRA appeals, and the reasons for delay, have been made supremely relevant by the Defender litigation strategies I described in my concurrence in *Commonwealth v. Spotz*, 18 A.3d 244, 330 (Pa.2011) (Castille, C.J., joined by McCaffery, J., concurring), where I noted, among other points, that the Defender had filed a federal Motion in *Commonwealth v. Dougherty*, 585 CAP, forwarding a global claim that this Court was "incapable of managing its capital docket." In addition to various factual misrepresentations, the Defender's federal motion blamed the Pennsylvania courts for state court delays in capital PCRA matters, without acknowledging the delays its litigation strategies had ensured in the very cases it cited. It is beyond coincidental, I suspect, that the reported cases detail at least two other instances where the Defender has raised *Atkins* claims, and then taken measures to avoid their determination. *Spotz*, 18 A.3d at 340–42, 345–47 (Castille, C.J., joined by McCaffery, J., concurring), (discussing *Atkins* delays in *Commonwealth v. Bracey*, 604 Pa. 459, 986 A.2d 128 (2009) and *Commonwealth v. Porter*, 557 CAP (pending)). The *Atkins* delay here confirms the concerns I outlined in *Spotz* regarding the systemic abuses inflicted upon Pennsylvania's state courts by the Defender's litigation strategies in capital cases.

–II–

Turning to the concerns expressed by Justice Saylor, I have conducted my own independent review of the record, including the extensive proceedings in the PCRA court. Justice Saylor has accurately noted superficialities and weaknesses in various rulings and findings below, and in the Court's review analysis here; and has highlighted some examples of problematic issues. On the other hand, as I have detailed in *Spotz*, I am mindful of the burden placed on the PCRA courts, and on this Court, by both the prolix filings of the Defender and their dubious litigation tactics, as revealed by the progress of the *Atkins* claim here, and the Defender's conduct at the PCRA hearing. I agree that a more particularized approach should

be followed by our PCRA courts and by this Court on review, at least respecting claims that are not obviously baseless. But, I do not believe that the PCRA trial courts, or this Court, can or should have allocations of resources determined by the Defender's litigation strategies. This is a delicate balance. In my view, the briefing reforms I suggested in *Spotz*, coupled with commensurate pleading reforms at the trial level to protect PCRA courts from abusive pleadings, may be the best way to ensure reasonable and rational review of non-frivolous claims.

Having said this, and respecting the claims of concern to Justice Saylor, my own review of the record convinces me that appellant was given a fair opportunity to identify and develop his collateral claims, that there is no impediment to this Court deciding the appeal now, and that appellant clearly is not entitled to relief. Given the criminal conduct at issue (two killings, six additional wounded victims, rape, and other lesser offenses), and the overwhelming evidence, this was a difficult capital case for any trial attorney. Appellant plainly had a fair bench trial before Judge Stout. His various collateral claims either lack merit—including those instances where he seeks to fault counsel for his own decisions—or he has not come close to showing a reasonable probability that the result of the trial, or the penalty proceeding, would have been different but for the lapses that he attributes to his counsel. With particular respect to the penalty phase, I conclude that the nature and strength of the aggravators alone (significant history of violent felonies and multiple murders) militate against an award of *Strickland* relief. *See Commonwealth v. Lesko*, 15 A.3d 345 (Pa.2011) (*Strickland* claims premised upon inclusion of additional mitigation evidence unlikely where defendant has been found guilty of multiple murders); *Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 293 (2008) (establishment of multiple murders aggravator may be enough to render verdict of death a "formality").

Justice SAYLOR, dissenting.

I cannot join the majority opinion in light of material differences with its rationale. Instead, I would remand for

appropriate post-conviction review, and I write to the following.

First, Appellant complains that, after multiple remands to obtain an adequate opinion from the post-conviction court, that court employed a near cut-and-paste approach from the Commonwealth's brief on appeal. To my review, the opinion, at the very least, does test the limits of compliance with a PCRA court's duty to produce an independent analysis of post-conviction claims. *See Commonwealth v. Williams*, 557 Pa. 207, 224–25, 732 A.2d 1167, 1176 (1999); *see also id.* at 254–55, 732 A.2d at 1192–93 (Castille, J., concurring). For example, the first eight pages of the opinion are taken almost verbatim from the Commonwealth's brief.

Second, the majority suggests that the colloquy attending Appellant's waiver of his right to a jury penalty verdict was sufficient. *See* Majority Opinion, op. at 238–39, 24 A.3d at 340. However, the majority downplays material portions of the record highlighted by Appellant, including the apparent suggestion by the prosecutor of a linkage between guilt- and penalty-stage jury waivers, *see* N.T., Nov. 16, 1998, at 57 (reflecting a motion's judge's comment that "the prosecutor goes on and on about if you have a trial by a judge without a jury then you have a penalty phase without a jury, which we all know is incorrect."),[1] and Appellant's responsive equivocation:

I understand partially. You are saying we waive our right to a jury trial and that's only a waiver. I don't think I waive my right to a jury trial on decisions because I don't know what the decision is yet.

N.T., Oct. 18, 1989, at 32.

It may be that Appellant's claim merits no relief given the weakness of the proofs concerning the reasonable strategy

1. I note that Appellant's trial occurred before the Commonwealth acquired its own constitutional right to a jury trial. *See* Pa. Const. art. I § 6 (as amended Nov. 3, 1998). At present, therefore, as a matter of conditions attached to its own waivers, it appears the Commonwealth may have greater leverage in linking guilt and penalty phase waivers. *Cf. People v. Diaz*, 3 Cal.4th 495, 11 Cal.Rptr.2d 353, 834 P.2d 1171, 1204 (1992) (accepting the validity of such linkage, in light of the government's right to a jury trial).

and/or prejudice prongs of the ineffectiveness standard, but it seems to me that the analysis should start with a frank acknowledgement that portions of this colloquy are *materially* confusing. *Cf.* Majority Opinion, *op.* at 238, 24 A.3d at 340 (alluding to "some potentially confusing points" in the colloquy).

Third, the post-conviction court and the majority, respectively, repeatedly made and credit findings favorable to the Commonwealth based on highly generalized testimony, disregarding the specific detail provided by the witnesses. For example, the PCRA court indicated that trial counsel made "every effort" to contact family witnesses.[2] Indeed, counsel so testified, for example, in response to a leading question by the PCRA court, as follows:

> THE COURT: Excuse me. I don't mean to interrupt. Based on everything [your investigators] told you, do you think that you did everything you possibly could to defend this defendant?
>
> THE WITNESS: Yes.
>
> THE COURT: Fine. What's the next question?

N.T., Sept. 13, 1999, at 36.

The difficulty is that the specifics provided by counsel demonstrated amply that he had little recollection of what actually was done. For example, when confronted with names of specific Birdsong family members, counsel most frequently did not remember any contact:

> Q: Do you know if [your investigators] spoke with Herbert [Freeman, Appellant's stepbrother]?
>
> A: I don't know.
>
> Q: ... How about George [Birdsong], Junior?
>
> * * *
>
> [A:] I don't know.

---

**2.** The majority dilutes the PCRA court's finding of "every effort" to "effort," Majority Opinion, *op.* at 250–51, 24 A.3d at 347–48, presumably in light of trial counsel's actual testimony, as quoted below. The difficulty with the majority's reformulation is that there is no accounting for the degree of the efforts involved, which is a necessary consideration in assessing reasonableness.

Q: You don't know if you spoke with him?

A: Correct.

Q: Do you know if [your investigators] spoke with him?

A: No, I don't know.

Q: How about Melvin Birdsong?

A: I don't know.

Q: And that's either you or [your investigators]?

A: That would be correct.

Q: How about Aserene Birdsong?

A: I don't know.

Q: And that would be true as to you and the [investigators]?

A: That's correct.

Q: How about Patricia Birdsong?

A: I don't have any recollection at this point.

Q: And that would pertain to the [investigators] and yourself; is that correct?

A: That's correct.

Q: How about Steve Birdsong?

A: I have no recollection.

Q: How about Angela Birdsong?

A: I have no recollection.

N.T., Sept. 13, 1999, at 46–48. The surviving investigator's testimony was that she was not aware that Appellant had multiple siblings, and she was able to confirm only a brief contact with Appellant's mother. *See* N.T., Jan. 4, 2000, at 25–26. Further, trial counsel testified that he could not recall whether he had so much as asked Appellant about his childhood. *See* N.T., Sept. 14, 1999, at 24.

It may be that, in light of the lack of memory and recorded information concerning the investigation, Appellant failed to satisfy his burden of demonstrating an inadequate investigation. On this record, however, I cannot see how the PCRA court's affirmative finding of "every effort" is rationally supported. Rather, from my perspective, the finding reflects an inappropriate looseness with the record. Furthermore, the

"every effort" perspective is in tension with the eleventh-hour mental health examination of Appellant—which counsel considered the heart of the penalty phase defense, *see, e.g.,* N.T., Sept. 13, 1999, at 126—occurring the evening before the penalty hearing. *See* Majority Opinion, *op.* at 240–41, 24 A.3d at 341–42.

Next, I differ with the majority's assertion that the testimony of Appellant's father would have been cumulative. *See* Majority Opinion, *op.* at 254, 24 A.3d at 349. In point of fact, no family member of Appellant's was offered as a witness at the penalty hearing. Moreover, the truncated life-history presentation (comprised of two direct examinations covering a total of six pages of transcript), and counsel's brief and substantially generic argument for life (covering three and one-half pages), reflect a disturbing recurrence we have seen in a number of these cases. *Cf. Commonwealth v. Sattazahn,* 597 Pa. 648, 675–76, 952 A.2d 640, 655–56 (2008) (crediting a post-conviction court's finding of deficient stewardship relative to a similarly "highly truncated mitigation presentation"); *Commonwealth v. O'Donnell,* 559 Pa. 320, 347 n. 13, 740 A.2d 198, 214 n. 13 (1999) ("[I]t is difficult to disagree with [the appellant] that a defense which amasses only four pages of transcript simply does not reflect adequate preparation or development of mitigating evidence by counsel representing a capital defendant in a penalty phase hearing.").[3]

**3.** I realize that the penalty presentation would have been longer had Appellant permitted the mental health professional to testify. A balanced assessment of this factor, however, would include consideration that Appellant (who undisputedly is of borderline intellect) was afforded very little time to process any information the psychologist was able to provide, and the expert had very little time to generate any trust and rapport with Appellant, as the examination occurred very late in the trial and on the eve of the penalty hearing. Moreover, frequently, a full development of the defendant's life history is necessary to serve as the factual predicate for the mental-health component of the testimony. Additionally, capital counsel bears the obligation to conduct a pre-trial investigation exploring all reasonably available avenues of mitigation. *See Commonwealth v. Williams,* 597 Pa. 109, 950 A.2d 294 (2008) (citing *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003), and *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 1514–15, 146 L.Ed.2d 389 (2000)). Accordingly, the failure of a late-trial effort to generate one line of mitigating evidence cannot excuse deficiencies in the investigation and development of others.

Finally, again without any express examination of specific instances raised by Appellant, the majority asserts that the PCRA court's interjections into Appellant's post-conviction case were mostly responsive to post-conviction counsel's attempts to circumvent court rulings and perpetuate redundancies. *See* Majority Opinion, *op.* at 255, 24 A.3d at 350. I do not disagree that there was overzealousness on counsel's part, but the record demonstrates that counsel's efforts were, as often as not, responsive to misunderstandings generated by the PCRA court. For example, in the following illustrative passage, the PCRA court complained about the presentation of witnesses to which the Commonwealth had no objection; misdirectedly focused on guilt phase matters when the evidence was addressed to the penalty stage; and mischaracterized Appellant's claims:

THE COURT: I'm not going to permit you to go into this. You think Judge Stout [would have] decided the case differently if she had known, rather, this defendant had a brother [who] also had an opiate addiction?

[COUNSEL:] Four. Four brothers that had died.

THE COURT: It doesn't matter. What's that got to do with this trial? Wait a minute. There was six or seven witnesses who personally identified this defendant as being the shooter and killer of two people.

Now, you have to show somehow that that was not a fair trial before Judge Stout.

[COUNSEL]: Judge, we're into the penalty phase.

THE COURT: And at the penalty phase, Justice Stout heard all the evidence, not only that, but the Pennsylvania Supreme Court exercising unitary review went into all that and decided that under the evidence presented to the court that this defendant deserved the death penalty. Now you're trying to show by this testimony of this attorney that for some reason he missed about going into the background and understanding of this man's past history including his four-year-old and twelve-year-old addiction, etcetera.

[COUNSEL]: Yes, Judge.

THE COURT: I think in my view, in my view that is not a pertinent inquiry before this court. Now, the history of his family life under the mitigating circumstances, true, but has to be timely towards sometime toward the time when this event occurred that would somehow have affected his conduct. You have not shown that at all.

[COUNSEL]: Judge—

THE COURT: You have not shown it.

[COUNSEL]: I would need to call Dr. Maher and Dr. Larson to show to you the genetic predisposition.

THE COURT: Are you saying that people who are genetically predisposed, for example, Indians who are high on drugs all the time have more rights in this country than everybody else?

Do they have a right to go around killing people because they can't get the death penalty because of their background and their drug abuse, but people who are straight and honest and law abiding and they do the shooting, they have to get the death penalty? Is that what you're saying?

[COUNSEL]: No, Judge.

THE COURT: That's what it sounds like to me. It sounds like you're trying to somehow classify this case by saying this defendant did not get a fair trial because A, B, C, D, all of the things that you have gone through, which are meaningless in my view.

[COUNSEL]: Well, Judge, I'm trying to say that—

[DISTRICT ATTORNEY]: We have no objection to counsel calling these witnesses, Judge, if he thinks this somehow is going to change.

N.T., Sept. 13, 1999, at 99–101.

Along these lines, the PCRA court also repeatedly offered up highly generalized interim findings as a means of truncating further testimony. *See, e.g.,* N.T., Jan. 5, 2000, at 160–61 (reflecting the PCRA judge's remark: "You want me to make a finding of fact right now? He had a very difficult upbringing, right, he was involved in the neighborhood where the gangs were among his brothers and so forth, and this was the

peer pressure."). I believe the approach to post-conviction litigation reflected in the above excerpts suggests an insensitivity to the nature of the weighing process in capital sentencing and the high burden borne by prisoners in the post-conviction process.

I do support judicious control of PCRA proceedings by our common pleas judges. Appropriate time limits may be set on presentations; irrelevant matters certainly may be excluded; reasonable interjections may be warranted; and the presumption in favor of the validity of a judgment of sentence is to be enforced. In this instance, however, various of the PCRA court's own explanations demonstrate a reluctance to extend fair latitude to one bearing the burden attending a challenge to a judgment of sentence in making the necessary record.

At bottom, it is my conclusion that the PCRA court's approach to this post-conviction case does not reflect the necessary close, judicial review. Hence, I would return the matter to it so that this may be accomplished. I note only that I find this to be a close case, in terms of whether a further remand is warranted, particularly due to the weight of the aggravation, including Appellant's perpetration of multiple murders.

Justice TODD joins this Dissenting Opinion.