J-S12024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DANIEL CARTER | : | |
| | : | |
| Appellant | : | No. 1328 EDA 2024 |

Appeal from the PCRA Order Entered April 25, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-1213321-1992

BEFORE:  STABILE, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED JULY 23, 2025**

Daniel Carter appeals from the order dismissing his Post Conviction Relief Act ("PCRA") petition. **See** 42 Pa.C.S.A. §§ 9541-9546. Carter maintains that he raised meritorious **Brady**[1] claims and challenges the admission of evidence at the evidentiary hearing. We affirm.

Following a bench trial, the trial court convicted Carter of first-degree murder, possession of an instrument of crime, possession of prohibited offensive weapon, and criminal conspiracy.[2] The charges arose from a shooting in the early morning hours of July 3, 1992. The court sentenced Carter to life imprisonment. We affirmed the judgment of sentence in 1995, and the Pennsylvania Supreme Court denied review in 1996. **Commonwealth**

---

[1] **Brady v. Maryland**, 373 U.S. 83, 87 (1963).

[2] 18 Pa.C.S.A. §§ 2502(a), 907(b), 908, and 903(a)(1), respectively.

*v. Carter*, 661 A.2d 390, 396 (Pa.Super. 1995), *appeal denied*, **Commonwealth v. Carter**, 675 A.2d 1242 (Table) (Pa. filed April 9, 1996).

Carter filed the instant PCRA petition, his fourth, in 2022. Counsel filed a supplemental petition claiming newly discovered evidence and raising the unknown facts time-bar exception. **See** 42 Pa.C.S.A. § 9545(b)(ii). The petition noted that counsel had reviewed the Philadelphia Police Department's file for Carter's case and, relevant to this appeal, found two statements "that were never provided to the defense[.]" Corrected Supplemental Petition for Post-Conviction Relief ("PCRA Petition"), filed 2/2/23, at 8. The statements were from Latrina Jones and Verinda Weekly. **Id.** at 10-13; Exhibit 8 ("Jones Statement); Exhibit 9 ("Weekly Statement").

Jones's statement was dated July 5, 1992, two days after the murder. Jones stated that she had previously lived with the victim and had seen him one day before the murder at her home. According to her statement, at around 1:00 a.m. on the morning of the homicide, the victim was talking to his sister on the phone at Jones's house. While on the phone with his sister, the victim received another call, and Jones heard him say, "You are at 3rd [and] Dickinson. Meet me at 5th [and] Moore." Jones Statement, at 2. The victim finished speaking with his sister on the phone and then told Jones, "I'll be back in a few minutes," and left the house. **Id.** The victim did not tell Jones where he was going or whom he was meeting. She stated that the victim had a friend named "Dave" and knew a man named "Jamil." **Id.** When asked if she knew who killed the victim, Jones stated:

> The only thing I can think of is about 3 weeks ago [the victim] told me that he wasn't going to mess with Kev or David. He said[,] "[I]f Kev calls I don't live here anymore". Last week [the victim] talked to David on the phone and I said[,] "I thought that you weren't going to mess with Dave anymore." [T]he victim said, "Dave is all right." "I don't want to be with Kev."

*Id.* at 3. Jones said that she did not know about the victim selling or using drugs. *Id.* Additionally, Jones shared that the victim carried a silver gun and that he "probably" took the gun with him when he left her home. *Id.* at 4. When she searched her home, she did not find the gun. *Id.*

Weekly's statement was dated July 4, 1992, the day after the murder. She stated she dated the victim for two and a half years. Weekly Statement, at 1. The victim had been at her house on July 2 between 7 p.m. and 10 p.m. *Id.* at 2. When asked if the victim had any problems with anyone, she stated:

> A couple weeks ago he told me that he couldn't go to West Philly because someone was looking for him but I saw him at the Deli  . . . after that and a couple of my friends said they saw him around there too. So I guess whoever was supposedly looking for him wasn't really because he wouldn't be hanging on 52nd St.

*Id.* She further explained that when she asked the victim who was looking for him, he would say, "It's nobody you know." *Id.* at 4. She then went on to explain a time when a man arrived at her home looking for the victim.

> About a week or a week and a half ago this young guy came to my house looking for [the victim]. They [sic] guy asked for "D". It was about 4AM. I told the guy that [the victim] didn't live here no more and the guy left. He went across the street to the phone booth and then he walked straight down 61st towards Cedar. Then a couple days later I saw him walking past my house and he was looking over. This

must have been about 5PM because I had just got home from work.

*Id.* She described the man and said she did not know the man's name but stated, "I would know him if I see him again." *Id.*

Police also asked her whether the victim sold drugs, and she responded, "He never had no money so I would say no. He was a user though." *Id.* at 3. She said that the victim had a friend named Dave and another male, but she could not remember his name. *Id.* Weekly said that the victim told her that he carried a gun during the time when he said people were looking for him, but she never saw it. *Id.* at 4. Weekly's statement ended with her saying that the victim gave people a hard time in the neighborhood but "I can't figure why someone would shoot him. I don't think he knew anyone in South Philly." *Id.*

Counsel also found a death penalty memorandum ("memorandum"), dated January 13, 1994, authored by a prosecutor. *See* PCRA Petition at 13; Exhibit 11 (Death Penalty Memo). The memorandum read in part:

> The victim, according to his mother, rips off drug dealers, defendant is known by police to sell drugs in the area. The salient facts are as follows: the victim was beeped and went to the playground after midnight on July 3, 1992. One of the individuals defendant was with that evening asked eyewitness D. Witherspoon's son, Shawn Bain, a/k/a/ Ali, for his (the son's) sawed-off shotgun; eyewitness refused. The individual came back with the defendant and the sawed-off shotgun was turned over to defendant and his co-conspirator. The three defendants walked into the playground and met up with the victim. The eyewitness followed them and saw defendant shoot the victim.
>
> No where [sic] in record, either in statements or in the testimony, is there a "drug" motive for the shooting. The victim's mother who stated her son rips off drug dealers (is

not on paper) lives in New York City and does not want to get involved. []Eyewitness's stepson, Ali, corroborates the giving of the shotgun to the defendant. He has an open bench warrant for drugs in juvenile court. Fourth district officers are trying to locate him to arrest him. He recanted as well at the preliminary hearing.

Death Penalty Memo at 1 (unpaginated).

Carter raised **Brady** claims for these newly discovered documents. **See** PCRA Petition at 15. He argued that the Jones and Weekly statements were "critical" because they identified alternative suspects for the murder and "Jones's statement puts a firearm" in the victim's possession before the shooting. **Id.** at 18. Additionally, he claimed that the memorandum was "significant" because it revealed an alternative motive for the murder. **Id.** at 19.

Counsel attached an affidavit where he represented that he spoke with trial counsel, who did not "have a specific recollection of the case." **Id.** at 22. He averred that trial counsel would "testify that he would have used much of the information discovered in the homicide files if it had been available to him insofar as it would have been consistent with his usual pattern and practice of defending cases." **Id.** Additionally, counsel filed an affidavit from Carter that he did not know that Jones and Weekly had given statements to the police and the statements were not in the discovery given to his trial counsel. **See** Affidavit, filed 2/27/23.

Counsel also included a letter from Edward Geigert, a private investigator, to James Lammendola, Esquire, Carter's first PCRA counsel. The letter read, "Pursuant to our conversation of Monday, February 16, 1998[,]

- 5 -

and pursuant to Mr. Daniel Carter's letter dated January 31, 1998[,] I started an investigation on behalf of Mr. Daniel Carter." PCRA Petition at Exhibit 4 ("Geigert Letter"). Relevant to this appeal, the letter also stated, "In Mr. Daniel Carter's letter he indicates that he had several witnesses who should have been called on his behalf at his original homicide trial[,]" including Jones and Weekly. *Id.*

The PCRA court determined that Carter had satisfied the unknown facts time-bar and held an evidentiary hearing to address the merits of his ***Brady*** claims. The court heard testimony from Carter's direct appeal counsel, Patrick Egan, Esquire, and Carter's *habeas corpus* counsel, Carole McHugh, Esquire.[3]

Attorney Egan testified that he represented Carter for his death penalty phase hearing and his direct appeal. N.T., Evidentiary Hearing, 1/3/24, at 8,10. In preparation for the appeal, he received Carter's file from Carter's trial counsel. *Id.* at 12. At the hearing, counsel reviewed Jones's and Weekly's statements and testified that he was "confident [he] never" saw them. *Id.* at 19-20, 25. He testified that if he had received the statements in the file from trial counsel, he "would have raised [trial counsel's] failure to introduce these witnesses and this evidence in and at the trial because of the fact that these are both evidence that is exculpatory and goes against the Commonwealth's theory of the case[.]" *Id.* at 20. Attorney Egan agreed that he did not have

---

[3] The court also heard testimony from Mark Culler. Carter does not challenge the denial of his after-acquired evidence claim as to Culler. Therefore, we do not reference his testimony.

an independent memory of everything included in the file given to him by trial counsel. *Id.* at 26-27. However, he testified that he felt if he had seen the statements, he would have remembered. *Id.*

Attorney McHugh testified that she represented Carter for his federal *habeas corpus* filing. *Id.* at 114. She received his file from Attorney Lammendola. *Id.* She testified that she had not seen Jones's and Weekly's statements and did not remember any reference to the statements in Carter's file. *Id.* at 115, 117. Attorney McHugh also testified that the statements "refer[red] to other possible doers and people in the neighborhood who were not happy" with the victim. *Id.* at 116. Attorney McHugh agreed that the addresses referenced for Jones and Weekly in the letter matched the addresses listed on their statements. *Id.* at 121-22.

On cross-examination, the Commonwealth questioned Attorney McHugh about Geigert's letter to Attorney Lammendola. *See id.* at 120. Attorney McHugh testified that she did not believe she had seen the letter before, and did not recall it being in the file Attorney Lammendola handed over, but stated that it "might have been there." *Id.* She recalled reading the notes of testimony from a 1998 PCRA hearing involving Attorney Lammendola but did not recall the Geigert letter being used at that hearing. *Id.* at 118-19. The Commonwealth also admitted the notes of testimony into evidence. *Id.* at 118, 128.

The Commonwealth moved to admit the Geigert letter into evidence. *Id.* at 129. PCRA counsel objected to the authentication of the letter. *Id.* at

146. The court reserved its decision on whether to admit the letter, and gave the parties time to brief the issue. At a subsequent hearing, the court addressed the admissibility of the letter. The court noted that PCRA counsel withdrew his objection to the letter based on authentication but challenged the admission of the letter on the basis of judicial estoppel, the coordinate jurisdiction rule, and hearsay. *See* N.T., PCRA Hearing, 4/25/24, at 7. The court agreed that the letter amounted to double hearsay and no exception applied. However, it determined that it was "extremely pro[bative] on the *Brady* suppression issue for its non-hearsay value." *Id.* at 8.

The court concluded that regardless of whether the contents of the letter were true, it was compelling evidence that Jones's and Weekly's statements were not suppressed or "alternatively the defense knew about them during the pendency of the first [PCRA] petition and failed to make a *Brady* claim[.]" *Id.* at 9. It pointed out that Carter presented no evidence to show how the defense would have known that Jones and Weekly "could've helped the defense at trial and what their 1992 addresses were, without the Jones and Weekly statements." *Id.*

The court also determined, based on the Geiger letter, that even if the statements were suppressed, Carter had waived his *Brady* claim. The court concluded that the letter showed that by 1998, Carter knew about the statements or the information contained in them. *Id.* at 10. The court went on to find that the testimony presented at the evidentiary hearing did "not

establish that the statements were not turned over" to trial counsel. *Id.* at 5.

The PCRA court dismissed the petition, and this timely appeal followed.

Carter raises the following claims:

1. Whether the PCRA Court erred in denying relief insofar as:

    a. the ruling that [Carter] failed to prove the Commonwealth withheld exculpatory statements was neither supported by the record nor free of legal error; and

    b. the ruling that [Carter] waived his **Brady** claim with respect to the exculpatory statements was neither supported by the record nor free of legal error?

2. Whether the [c]ourt erred in dismissing [Carter's] **Brady** claim pertaining to information gleaned from a death penalty memo in the prosecution's file, i.e., that decedent was known for robbing drug dealers, without an evidentiary hearing?

3. Whether the [c]ourt erred and/or abused its discretion when it received a letter from a private investigator into evidence as proof that the Commonwealth had not withheld the aforementioned statements?

Carter's Br. at 7 (reordered).[4]

Our standard of review of the dismissal of a PCRA petition is settled:

> In reviewing the denial of PCRA relief, we examine whether the PCRA court's determinations are supported by the record and are free of legal error. ***Commonwealth v. Spotz***, 610 Pa. 17, 18 A.3d 244, 259 (2011). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de*

_____

[4] Carter's second and third issues are reversed in the argument section of his brief. We have listed the issues based on the order they are addressed in the brief.

*novo* standard of review to the PCRA court's legal conclusions. *Id.*

***Commonwealth v. Natividad***, 200 A.3d 11, 25 (Pa. 2019).

A PCRA petition must be filed within one year of the judgment of sentence becoming final. 42 Pa.C.S.A. § 9545(b). Beyond this one-year deadline, the petitioner must plead and prove at least one time-bar exception. *Id.* at § 9545(b)(1)(i)-(iii). Where the petitioner establishes a time-bar exception, the court may address the merits of the claims raised in the PCRA petition. *See Natividad*, 200 A.3d at 29.

Here, Carter raised the unknown facts time-bar exception, which the PCRA court concluded he had satisfied. *See* 42 Pa.C.S.A. § 9545(b)(1)(ii). The court accordingly addressed the merits of Carter's ***Brady*** claims.

To establish a ***Brady*** violation, a defendant must show that "the prosecution suppressed the evidence, either willfully or inadvertently; the evidence is favorable to the defendant; and the evidence is material." ***Commonwealth v. Birdsong***, 24 A.3d 319, 327 (Pa. 2011). A court reviewing a ***Brady*** claim does not review the evidence in isolation but instead must evaluate the omission of evidence "in the context of the entire record." ***Commonwealth v. Dennis***, 17 A.3d 297, 309 (Pa. 2011).

Carter argues that the PCRA court erred in its conclusion that he failed the first prong for a ***Brady*** violation: that the prosecution suppressed Jones's and Weekly's statements. He maintains that Attorney Egan testified credibly that he did not remember seeing the statements in Carter's file. Additionally, Carter points out that the Commonwealth did not present any evidence to

- 10 -

rebut Attorney Egan's testimony, such as providing a discovery log or testimony from the trial prosecutor. He also claims that the Geigert letter did not prove that the Commonwealth gave trial counsel the Jones and Weekly statements. Instead, Carter claims the letter merely show that the defense knew of the witnesses and their addresses. He argues "[t]hat someone may have information that is contained in a document does not prove the person had possession of that document, especially if the information at issue (such as a name and address) could have been obtained elsewhere." Carter's Br. at 29.

The PCRA court concluded Carter had not established that the Commonwealth failed to turn over Jones's and Weekly's statements. The court explained that "neither attorney could definitely say that the Commonwealth failed to turn over the Jones and Weekley Statements in discovery, and neither of them knew whether the statements had been turned over to [trial counsel]." Rule 1925(a) Opinion ("1925(a) Op."), filed 7/25/24, at 15-16. The court also pointed out that the Commonwealth passed discovery to trial counsel, but trial counsel did not testify at the evidentiary hearing. *See id.* at 15.

Carter bore the burden of proving that the Commonwealth withheld the statements. *See Birdsong*, 24 A.3d at 327. Viewing the record in its entirety, the statements were found in a police homicide file. Both Attorney Egan and McHugh gave speculative testimony about whether the statements were in the trial file. As the PCRA court noted, neither attorney could definitively say that

- 11 -

the statements were not in the files handed to them by trial counsel or Carter's first PCRA counsel, Attorney Lammendola. Although PCRA counsel filed an affidavit stating that he spoke with trial counsel and that he would testify he would have used much of the information discovered in the police department's file, if it had been available to him, trial counsel did not testify at the evidentiary hearing. In any event, the PCRA court determined, as a matter of weight and credibility, that Carter had failed to carry his burden of proving his claim. The PCRA court's determinations are supported by the record and are without legal error.

Carter also argues that the court's determination that he waived his *Brady* claim as to the statements was erroneous. He maintains that the court's conclusion "rests again on the assumption that the Commonwealth's proofs establish that Mr. Carter was actually in possession of these statements in 1998." *Id.* at 30. Because we have determined that Carter failed to prove the suppression of the statements, we do not address whether the court erred in concluding in the alternative that Carter waived his *Brady* claim.

Next, Carter alleges that the court erred in dismissing his *Brady* claim as to the death penalty memorandum. He notes that the court determined that the memorandum would be inadmissible. Carter maintains that the admissibility of the memorandum is irrelevant for purposes of *Brady* and argues that the memorandum is relevant because it gave another motive for the victim's murder.

The PCRA court rejected Carter's **Brady** claim as to the death penalty memorandum "because the information contained in the memorandum is not exculpatory." 1925(a) Op. at 17. As Carter states, the court also determined that the memorandum "would not be admissible in evidence and would not, in any manner, undermine the Commonwealth's case or be otherwise helpful to the defense." **Id.**

As previously discussed, to succeed on a **Brady** claim, the defendant must show that the suppressed evidence is favorable to the defendant. **See Birdsong**, 24 A.3d at 327. Evidence is considered favorable to the defendant if it is "exculpatory or because it impeaches[.]" **Commonwealth v. Roney**, 79 A.3d 595, 607 (Pa. 2013) (citation omitted). Exculpatory evidence for purposes of **Brady** includes "evidence that reflects upon the culpability of the defendant" and "evidence of an impeachment nature that is material to the case against the accused." **Commonwealth v. Strong**, 761 A.2d 1167, 1171 (Pa. 2000).

Here, Carter did not establish that the death penalty memorandum was exculpatory. The information contained in the memorandum was not exculpatory or of impeachment value. **See id.** The memorandum stated that according to the victim's mother, he "rips off drug dealers" and that Carter had been known by police to sell drugs in the area. **See** Death Penalty Memo at 1 (unpaginated). Although the prosecutor noted that there was no evidence of a drug motive, if the words of the victim's mother are considered true, the memorandum establishes a motive for Carter to have killed the victim. As

such, we conclude that the PCRA court correctly concluded that Carter failed to establish that the memorandum was exculpatory.

For his final claim, Carter alleges that the court erred in admitting the Geigert letter. He challenges the admissibility of the letter based on judicial estoppel, the coordinate jurisdiction rule, and hearsay. He claims the court relied on the letter for the truth of the matter asserted. Carter points out that at a 1998 PCRA hearing, the Commonwealth convinced the court that the letter was not admissible for its truth but in the present proceeding, it sought to use the letter for its truth. *See* Carter's Br. at 38 (citing N.T., Evidentiary Hearing, 10/28/98, at 33). Carter claims the Commonwealth was judicially estopped from changing its position. *Id.* at 39 (emphasis removed).

Carter also claims that the admission of the letter was barred by the coordinate jurisdiction rule. He notes that the judge at the 1998 PCRA hearing found the letter to be inadmissible and alleges the Commonwealth is asking this Court to overrule that judge's determination. Additionally, Carter asserts that the rule against hearsay prevents the admission of the letter. He argues that no hearsay exception applies. Carter also claims there is a question as to who wrote the letter and "whether Geigert himself accurately summarized" what he referenced in the letter. *Id.* at 42.

The PCRA court states that it admitted the letter into evidence "not for its truth but rather for its non-hearsay value." 1925(a) Op. at 14. It maintains that regardless of the truth of the contents of the letter, the letter was compelling evidence either that the Jones and Weekly statements were not

suppressed or that the defense knew of the statements during Carter's first PCRA petition but failed to raise a ***Brady*** claim then. ***See id.*** at 14-15 (quoting N.T., PCRA Hearing, 4/25/24, at 9).

We review the admission of evidence for an abuse of discretion. ***See Commonwealth v. Watkins***, 108 A.3d 692, 736 (Pa. 2014). Hearsay is an out of court statement used to prove the truth of the matter asserted. Pa.R.E. 801(c). Hearsay evidence is inadmissible unless an exception applies. Pa.R.E. 802. However, "[a]n out-of-court statement is not hearsay when it has a purpose other than to convince the fact finder of the truth of the statement." ***Commonwealth v. Busanet***, 54 A.3d 35, 68 (Pa. 2012).

Carter's claim is meritless. The court did not abuse its discretion by admitting the letter into evidence. The letter referenced Jones and Weekly as helpful witnesses, and Carter's ***Brady*** claim alleged the suppression of Jones's and Weekly's statements. Jones and Weekly were the victim's girlfriend and ex-girlfriend at the time of the statements. Notably, at the evidentiary hearing, Attorney Egan testified that Carter did not know the victim and had no relationship with the victim. N.T., Evidentiary Hearing, 1/3/24, at 21. Thus, the mention of the victim's girlfriends in the letter was relevant to Carter's ***Brady*** claim regarding their statements. Regardless of the truth of the contents of the letter, it demonstrated that the defense had access to the letter mentioning Jones and Weekly in 1998 and that it had been used by defense counsel at a hearing related to Carter's first PCRA petition. Therefore, the court properly admitted the letter for a non-hearsay purpose. Carter's

challenges to the admission of the letter under principles of judicial estoppel and coordinate jurisdiction fail since the letter was not admitted for its truth.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/23/2025